STATE of Tennessee, Appellee,
v.
Steven GREEN, Appellant.

No. 755.

Court of Criminal Appeals of Tennessee, at Knoxville.

May 26, 1982.

Permission to Appeal Denied by Supreme Court Nov. 22, 1982.

Robert L. Jolley, Jr., Asst. Atty. Gen., Nashville, Stanley J. Lanzo, William Cox, III, Asst. Dist. Attys. Gen., Chattanooga, for appellee.

Charles O. Ragan, Jr., Chattanooga, Edward E. Augustine, Atlanta, Ga., for appellant.

OPINION

DAUGHTREY, Judge.

The sole issue raised by this appeal is the sufficiency of the evidence to support the defendant's first degree murder conviction for the slaying of a Chattanooga police officer. At trial the defense offered both lay and expert testimony to establish that 18 year old Steven Green was insane at the time he committed the offense. After a review of the record, we find that the State's rebuttal evidence was not sufficient

to refute the overwhelming proof of defendant Green's insanity.

■ We do not reach this conclusion lightly. As the United States Supreme Court noted in *Burks v. United States,* "[w]hen the basic issue before the appellate court concerns the sufficiency of the Government's proof of a defendant's sanity (as it did here), a reviewing court should be most wary of disturbing the jury verdict." 437 U.S. 1, 17 n. 11, 98 S.Ct. 2141, 2150 n. 11, 57 L.Ed.2d 1 (1978). However, as the *Burks* court also pointed out, "[t]here may be cases where the facts adduced as to the existence and impact of an accused's mental condition may be so overwhelming as to require a judge to conclude that no reasonable juror could entertain a reasonable doubt." *Id.* We think the matter before us is one of those rare cases.

Tennessee law utilizes the American Law Institute's Model Penal Code § 4.01 to determine the question of an accused's sanity. *See Graham v. State,* 547 S.W.2d 531, 543 (Tenn.1977). That rule provides that "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." *Id.* At trial the State disputed the fact that the defendant in this case suffered from a mental disease or disorder. On appeal the State argues that Green had the capacity to know right from wrong and to control his behavior at will. As to both contentions, the evidence in the record shows otherwise.

■ On the evening of January 18, 1979, Chattanooga police found the body of Officer Harry Wilcox in a restroom at Warner Park. The corpse, clothed in a blue park police uniform, was lying face down in a pool of blood. The victim had been shot twice in the head, and his police revolver was missing. On the victim's back officers found a plastic bag containing a note. The note, addressed to Agent Ray Hanrahan of the FBI, contained a meaningless string of words and phrases, including reference to an "ousiograph." Because of its central importance to the question of Green's sanity at the time of the offense, the note (both front and back) is reproduced here:

SQUIRRiL And His Nuts    Ray HannRan

MR Dime (1,00,000⁰⁰) Dollars FBI

ASS is OlD MuD. BOTTom  OutFit and JWiTch

4—2 5+ With RADiO(ousiognAPH) GoT Hlep Money naDE
SAveD in Time connections SevereD On YOU.(Smoken)

Hope Boss+ cathy Make  STyvesent Texas Tesue/SLT
+$ 1.Dog car caught
              FLAT RADi Televis Pape inFoRMED
  GaNg was   SDF
                            INFORMED

        GaNG Mat
        'GaNG WAR   SDF

When police arrested Green two days later, they found on his person two other notes that had been torn into pieces. Reconstructed, these two notes were found to have references to "Ray Hanrahan, Commercial Union Bank, West 7th Street," to "Mr. Dime" and to an "oustograph."

Police were led to Green by contacting FBI agent Hanrahan, who had talked to Green a few weeks before the murder and whose notes of their conversation included Green's name. At trial Hanrahan testified that Green had come to the FBI office in the Commerce Union Bank Building and told the agent that some people in New York were talking to him, sending messages to his brain, and "directing" him. Green told Hanrahan that a doctor in New York had invented a machine called an "oustograph" or "ousiograph" that could detect these matters. He asked Hanrahan to find out about the oustograph for him. Hanra-

han looked up the word in a dictionary and contacted a radio technician, but could not learn anything about such a machine. Hanrahan said he thought the defendant "had [mental] problems," and he suggested to Green at the time that he go to Erlanger Hospital to seek help.

Hanrahan's perception of the precariousness of Green's mental health was indeed accurate. Green had first received psychiatric treatment at the age of seven when as a child in New York City he was suspended from school for picking fights with other children "for no reason at all . . . , beat[ing] them up really viciously." At that time he began seeing a psychiatrist who diagnosed his problem as paranoia. After treating the defendant for over two years, the psychiatrist pronounced Green "all right" but warned that the condition could recur during his teenage years. At age twelve, Green attacked his mother with a knife and again received psychiatric treatment.

By the time Green was sixteen, he had become a loner. He refused to go to school, remained in bed all day, and stayed out all night. He refused to bathe. He would not talk to anyone, and when spoken to, he would not respond or would laugh hysterically. Green carried a bag around with him, explaining to his parents that the bag "kept him company." He complained that the television talked back at him. At first Green insisted there was nothing wrong with him, but he eventually agreed to accept psychiatric treatment. After he was hospitalized for more than a month in 1978, his family reached the limits of their insurance coverage, and Green was transferred to an out-patient clinic. During this period he was heavily medicated and "was just like a zombie." Because the medication made Green so drowsy he could not study, he stopped taking the medicine and refused to visit the out-patient clinic.

Green enrolled in a Navy reserve program, returned to school, and managed to graduate from high school in June 1978. Immediately after graduation, he reported for Navy training, but a few weeks later the Navy discharged him for failure to adapt to regulations. When he returned home from the Navy, Green resumed his old behavior patterns. He stayed in bed during the day and walked the streets at night. He had a fight with his brother and cut him on the leg with a knife. He said that other people in the apartment building had a machine that tampered with his brain. He felt that the television talked back at him; he thought people talked about him; and he was suspicious whenever the telephone rang. The defendant would not bathe or change his clothes. Toward the end of August 1978, he stole the family's household money and left home.

In September 1978, the defendant turned up in Chicago. From there he called an uncle, Noah Green, who arranged for the defendant to come to Memphis. Green stayed with his uncle in Memphis for six to seven weeks. At trial Noah Green described his nephew's bizarre behavior during that time. When the defendant first arrived in Memphis he had not bathed, and during the course of his stay, Noah Green had to insist that he wash. The defendant told his uncle about an "oustograph," a kind of machinery that dealt with the mind, and asked his uncle why people were following him. The defendant would stay in his room all day and only went outside when his uncle insisted. He would pace the house at night. Sometimes he locked himself in the bathroom, but ran the shower without bathing. Green laughed at inappropriate times, and he would stare into space and move his mouth without saying anything. Twice the defendant visited a mental health clinic, but each time he refused to cooperate with the doctors. The medical staff told his family that because Green had not yet exhibited violent tendencies, he could not be hospitalized involuntarily. By November 1978, Green's behavior had become so bizarre that Noah Green feared for the safety of his young children and asked his nephew to leave. Green then went to stay with an aunt, Julia McNair, who also lived in Memphis.

Green lived in McNair's home for two weeks. She testified that during that time he never went out, he kept her apartment in darkness, and he refused to bathe. He would not talk to other people but laughed and talked to himself constantly.

When a psychologist at the local mental health center told McNair that the defendant needed to be hospitalized and that he might "go off at any time" and "do anything," she became frightened. She told her nephew that he would have to leave her home if he did not seek medical help immediately. When he refused, she called her brother, the defendant's father, and told him to come get Green and take him back to New York City. When Green's father arrived in Memphis, the defendant insisted that he did not need treatment and refused to return to New York. His father bought him a pair of shoes, paid for a hotel room for him, and gave him some money. Before the elder Green left for New York, he and his son went to a family dinner at another relative's house. At that time the defendant was able to function, his father said, but he "still was not right."

Some two months later, in January 1979, the defendant was arrested and charged with the Wilcox murder. His father came to Chattanooga at that time and visited Green in jail. He noticed a marked deterioration in his son's condition. Young Green was "agitated" and "mumbled" continually to himself.

In March 1979, John Littleton was hired as local counsel for Green and went to the jail to interview his client.[1] Despite the lawyer's efforts to establish rapport with Green, he found none of the interest usually displayed by an accused in the handling of his case. Instead, Littleton said, Green was "extremely apprehensive and afraid, also very unresponsive, very disturbed..., very withdrawn, [and] would hardly talk at all other than to acknowledge who he was." Littleton said Green stared at the walls as though he might have been hearing voices. Littleton immediately asked for a psychiatric examination of Green, which was ordered by the trial court on March 5, 1979.

As a result of the court order, Green was first seen by Dr. Stanley Speal, a forensic psychologist, on March 12, 1979. (A forensic psychologist, according to Speal, is a clinical psychologist who functions as an "objective evaluator" for the court, rather than as a treating psychologist or an "advocate for the client.") Speal saw Green on several occasions between March 1979 and November 1980 and diagnosed the defendant as paranoid schizophrenic, a condition which is characterized by irrational thinking, feelings inappropriate to the situation, an overly suspicious nature, hostility, and delusions of grandeur and of persecution.

Although Green was initially thought competent to stand trial, no immediate evaluation was made concerning his mental condition at the time of the offense. However, Green "steadily refused medication ... and his condition deteriorated as a result," so that by May 1979 it was necessary to hospitalize him for a reevaluation of his competency.

Green was sent to the Middle Tennessee Mental Health Institute in Nashville, where in July 1979 he was found to be incompetent to stand trial. The staff of the Forensic Services Division also concluded that he was insane at the time of the offense, as well as committable and in need of maximum security. In September, he was found to be "likely to injure himself or others if he is not treated" in an appropriate facility. By December 1979 he had improved to the point that the staff considered him competent to stand trial, but he was diagnosed in February 1980 as being paranoid schizophrenic, in only "partial remission," and still in need of hospitalization in a secure facility. By May 1980, however, he was found to be "greatly improved," his paranoid schizophrenia was noted as being in remission, and the hospital staff recommended that he be returned to Chattanooga for trial.

At Green's trial in November 1980, various members of his family from New York City and Memphis outlined the defendant's social and psychiatric history, beginning with his initial treatment at age seven, up to the time he left Memphis in November 1978. FBI Agent Hanrahan then described

---

1. Littleton apparently withdrew from the case when he was appointed Assistant United States Attorney.

his interview with Green in November or December 1978, an event which led him to the conclusion that Green needed hospitalization for his mental problems. The local attorney who first represented Green described his condition as it existed some six weeks after the killing and outlined his efforts to have Green psychologically examined.

The observations and conclusions of these lay witnesses were confirmed by several expert witnesses who testified at trial, including Dr. Samuel Pieper and clinical nurse Robin Shanks, both of whom were on the staff at Middle Tennessee Mental Health Institute. The expert testimony establishing Green's insanity in January 1979 is clear, consistent, and convincing, and the State offered no corresponding expert testimony to refute it. The medical experts in this case had the benefit of reports by other professionals who had examined and treated the defendant in New York City and Memphis, as well as Bellevue Hospital records from his 1978 hospitalization. They testified, and there is no evidence to the contrary, that they and all the other professional staff members who came in contact with Green after his arrest agreed unanimously that he was insane at the time of the offense.

Dr. Speal saw Green on six separate occasions between March 16, 1979, and September 17, 1980. He administered tests in March 1979 that showed that Green was psychotic at that time, "without a clear perception of reality, prone to delusional thinking." These delusions were of both the persecution and grandeur varieties, indicating a condition of paranoid schizophrenia. Describing a person in this condition, Speal said that:

> ... his thinking is irrational, he will say words that don't mean anything at times, he can't think logically..., his feelings [are] not appropriate to the situation. He may be extremely angry if someone just bats an eyelash or doesn't look at him right....

Dr. Speal further indicated that Green was suffering from auditory hallucinations when he examined him and that he appeared to have a history of such hallucina-

tions; Speal reached the conclusion that "[i]t was as a result of these voices that the killing took place." He described Green's delusion concerning the "oustograph" and Green's fear that this "mind control device" was monitoring his brain from New York. In Speal's opinion Green "was in great pain at that time because of this delusion [that he was being controlled by unknown people in New York]." Dr. Speal concluded on the basis of his 18 month contact with Green that the defendant had been insane at the time the offense was committed.

Dr. Pieper, a neurologist and psychiatrist at Middle Tennessee Mental Health Institute, was a member of the medical team that evaluated Green. In addition to the defendant's grandiose and persecutory delusions, the doctor said Green suffered from "bizarre delusions," i.e., those "in which things are so odd that we simply use the word bizarre to describe them.., [as w]hen you think that a TV set controls your mind and sends messages into your mind." Pieper said that Green's delusion concerning the oustograph fell into this category. Pieper testified that he reached the conclusion that Green was insane at the time of the offense based on his social and medical history, as confirmed by his post-arrest condition. Noting Green's "steady decline" from a good student with a basketball scholarship in high school, to his Navy discharge for failure to adapt, to his inability to support himself in Memphis and his eventual vagrancy in Chattanooga, Dr. Pieper said that schizophrenia "commonly occurs in young adults with symptoms perhaps having been present during the late teenage years" and that it is "unusual but it does occur that schizophrenia can develop in young children, that is, under the age of ten." Asked about Green's failure to tell the staff for over a year after the event about the hallucinations he had on the day of the killing, Pieper said that paranoid schizophrenics frequently deny hearing voices, as Green initially did, but that they can be observed actually responding to such voices. He said that from observing the defendant's behavior over a period of time, the staff had concluded that Green was indeed hallucinat-

ing at the time he was hospitalized and for some considerable period of time thereafter.

Dr. Pieper noted Green's "quite pervasive" and "consistent pattern" of psychosis with paranoid delusional thinking, originating in his early teenage years. He concluded that at the time Green killed Wilcox he was acting under the control of delusions or hallucinations or both, that he therefore did not understand that his act was wrong and could not conform his conduct to the requirements of law.[2] In short, it was the doctor's opinion that Green was insane under the *Graham* test.

Another member of Green's medical team at the Institute was Robin Shanks, a nurse clinician specialist in the hospital's forensic division. She described the drug psychotherapy administered to Green that gradually led to his improvement. The effect of this medication, which included such powerful anti-psychotic drugs as Thorazine, Haldol and Navane, was to enable Green "to bring his thoughts together." After months of treatment, Green was finally able to recall and communicate to the staff what occurred on the day Wilcox was killed. Although his various recollections of the event were not entirely consistent, the defendant told the staff in effect that he had acted in response to voices telling him that if he killed, he would be Adolf Hitler.

Shanks described Green as initially talking only in "gibberish." (When asked by one hospital staff member what language he was using, Green replied that it was Chinese; however, a Chinese-speaking staff member knew otherwise). Gradually, under medication, Green's gibberish gave way to coherent language and there was a lessening of both his inappropriate laughter and his tendency to talk to the ceiling. This improvement, Shanks said, was mainly attributable to the medication Green was receiving; the other factor was his presence in a highly structured environment. She said Green showed no signs of "faking", and she concluded that he had been insane at the time of the offense.

The State's rebuttal evidence, offered to establish the defendant's sanity at the time of the offense, consisted of testimony by five Chattanooga police officers and a former county employee. The first of these witnesses was Terry Slaughter, the detective who arrested Green on January 20, 1978, for the Wilcox killing. He described Green as "cooperative," "coherent," and "intelligent," but said that Green did not want to discuss the shooting. In the two hours he spent with Green, Slaughter noticed no bizarre behavior nor any sign that Green was "under delusion." However, on cross-examination, Slaughter conceded that the note found on Wilcox's body was strange, that he had never found a note on a corpse in nine years of police work, and that he had asked Green's mother if her son had "mental problems." Asked if he had also told Green's lawyer that this would be an "easy case" for him because the accused was "crazy as a loon," the detective responded, "I don't remember expressing it in that way.... I remember expressing the thought to you that I thought the party [Green] needed help."

Officer Janus Marlin, a Warner Park patrolman and a colleague of the victim's, found Green huddled in a phone booth in the park on December 27, 1979. Green had taken refuge there to get out of the cold and told Marlin he had "no place to go." The officer took him to a nearby rescue mission. Asked if there was "anything out of the ordinary" about Green at the time, Marlin said no, but also testified that "he was dirty and he smelled."

Officer John Bishop arrested Green for vagrancy on the night of December 19, 1978, when he found him sleeping in a city courtroom. He arrested Green a second time on December 29 for loitering in a service station restroom and begging from customers. Green told Bishop at that time that he had no where to go. Asked by the prosecution if he noticed anything out of the ordinary about Green, Officer Bishop

---

**2.** Pressed on cross-examination, the witness said that Green *may* have known the wrongfulness of his act, but that he doubted that this

was the case; in any event, Pieper said, it was clear that Green could not conform his behavior to the dictates of law.

said only that the defendant was "fairly quiet," "very polite," and "just answered the questions."

Officer Richard Alexander arrested Green for vagrancy on January 20, two days after the Wilcox killing, as Green "was walking the streets at [a] late hour of the night . . . trying to find someplace to stay warm." The officer described Green as coherent, but said that he apparently "[j]ust . . . had a lack of concern about anything." [3] In response to a question by the prosecution concerning evidence that Green "was under any delusions or hallucinations at the time," the officer responded negatively, saying that he was with Green for about 40 minutes. He did note, however, that Green was unkempt and dirty.

Another Warner Park patrolman, Sam Foster, saw Green in the early part of December. Foster told Green that he could use the restroom facilities but could not stay there; Green was in the men's room for 15 minutes and then left of his own accord, walking some distance away to a bench, where he lay down. Officer Foster said Green acted "normally."

Finally, the State offered testimony by a former county employee, William Cox, who gave Green a ride in his county-owned transportation van near the Hamilton County garage on January 18, 1979, the day Officer Wilcox was killed. Cox said he let Green into the van under the assumption that Green was also a county employee. In fact, Green had just been released from the county workhouse nearby. He was carrying what was apparently his only possession at that time, a pair of shiny black shoes. During the 45 minutes they were in the van together, Cox said, they engaged in "small talk." In response to a question by the prosecution, the witness agreed that he noticed nothing out of the ordinary about Green.

From this testimony, the State took the position that Green was "not insane and crazy and bizarre at the time [the Wilcox killing] happened," but was just "a little bit different." However, the testimony of the various State witnesses, all of whom had had only brief contact with Green over a period of several weeks and described him as "normal," is not inconsistent with a determination that Green was insane at the time of the offense. The medical experts testified, and their testimony is unrefuted, that a paranoid schizophrenic can operate in a *seemingly* normal way. As Dr. Speal put it, "as long as you have a distant relationship with them, they can almost appear normal." Dr. Pieper concurred in this conclusion, saying that a paranoid schizophrenic can "function in a manner which appears to be normal and it's accepted as normal by the general public." Going further, he noted:

> Paranoid schizophrenic people have a characteristic of what we call encapsulated delusions. That is they may have some abnormal thoughts that are about a very particular area and as long as you stay out of that area everything looks pretty good. When you get inside this area, then you realize that this doesn't make sense, it's illogical, it's bizarre, you know, it just doesn't make sense. When the person is functioning in areas which don't require any thinking about that particular problem, they can look pretty normal. They can get on a bus and ride the bus and no problem. But if somebody asks them a question or says something or makes a movement that they regard as threatening, suddenly all of this bizarre thinking takes charge and at that point they may react in any sort of way that's totally unexpected and totally irrational. The only time that I was ever hit by a patient in working with them for fifteen years was by a paranoid schizo-

---

**3.** This description of apathetic behavior is consistent with the symptoms of schizophrenia outlined in *Sampson v. State,* 553 S.W.2d 345, 347 (Tenn.1977): "The outstanding features of these disorders are the bizarre thought content and the odd behavior of the patient, his apparent alienation from the world of reality, *an apathetic flattening of mood which may at intervals be punctuated by apparently inappropriate periods of great intensity,* the presence of delusions (false beliefs), illusions (false interpretations of stimuli), and hallucinations (perception of external stimuli not present)." (Emphasis added.)

phrenic who suddenly and for no reason at all, the best I could tell, swung and hit me. Now, in retrospect I knew that that might occur, but I couldn't predict when it was going to occur.

To undercut the weight of the medical testimony, the State tried to establish that Green was faking his symptoms, or, in the alternative, that his psychosis was the result of the Wilcox killing and not its cause. The record clearly and eloquently refutes these theories.

At trial the State stressed that some 18 months after the crime, the defendant told the hospital staff that he killed Wilcox, but claimed that he was "temporarily insane" and should be set free. The State insisted that this statement proves that Green's defense of insanity is concocted. The medical evidence shows, however, that this statement was made late in the course of the defendant's treatment, when his recollection of the events had finally begun to take shape. The record shows conclusively that for the preceding year and a half, Green was in the grips of a deep psychosis. There is simply nothing in the record to prove that his symptoms were faked.

Taking the matter of Green's hallucinations as an example, it is instructive to note Dr. Pieper's description of Green's behavior:

He had not admitted that he was having hallucinations. I don't believe that we have any record of that. We do have recorded that he was noted to frequently laugh and smile inappropriately, often gesturing with his hands, he speaks rapidly and at times his soft voice becomes inaudible. Those are the kinds of behavior that you see in a person who is hallucinating, who's got this other person there in the room with him that he's carrying a conversation on with in his mind. You can't see that person, I can't see that person, but the person who's having hallucinations thinks that it's real. He's behaving as if there is a real person in the room with him other than those who are present.

While it frequently happens that an accused will claim "temporary insanity" when faced with evidence of guilt, it is difficult if not impossible to believe that Green was able to fake the symptoms outlined above successfully enough to fool the highly trained and experienced medical personnel who both evaluated and treated him in this case.

Moreover, the extensive history of Green's mental illness, going back over a decade and evidenced by medical and hospital records, as well as the cogent testimony of his family and the experts who diagnosed and treated him, wholly refutes the idea that Green dropped into a sudden psychotic condition upon shooting Officer Wilcox. The disease from which he suffered is a progressive one, and as Dr. Speal noted, his condition following the offense can be related back to the time of the offense, since there is "no reason for him to have been better adjusted at the time of the offense because he was not on medication at that time," and since his history indicated that "he has been psychotic for most of his life, if not all of his life."

As for the delusions that Green later discussed with the medical staff, Speal rejected the idea that Green was "building a defense," saying that the delusions described by Green long after the fact were "consistent with the delusions that he had all during the time we were evaluating him."

But the most crucial evidence to corroborate the experts' opinion that Green was insane at the time of the offense is the note found on the victim's body. Not only is the act of leaving a note unusual, as one of the State's own witnesses conceded, but the content of the note in question also relates Green's condition at the time of the offense backward (to the time of his conversation with Agent Hanrahan) and forward (to his obviously psychotic condition during the 18 months following his arrest). It is cogent evidence of a deeply disturbed young man, haunted by delusions of mind control, searching for liberation from his torment through an imaginery "oustograph," in communication with voices others could not hear.

Given the nature of the evidence offered by the defendant, the burden of proof in this case fell squarely on the State to estab-

lish the defendant's sanity beyond a reasonable doubt. *Graham v. State, supra,* 547 S.W.2d at 544. Under the *Graham* standard, it was incumbent upon the State to prove (1) that at the time of the offense the defendant was not suffering from a mental disease or defect, *or* (2) if he was, that his illness was not such as to prevent him from knowing the wrongfulness of his conduct *and* from conforming his conduct to the requirements of the law. *Id.* at 543. A failure to meet the *Graham* test beyond a reasonable doubt would, of course, necessitate an acquittal in this case.

The State sought to discharge its burden of proof at trial by proving that the defendant was "normal," that is, that his conduct at the time of the offense was not the "result of mental disease or defect." *Id.* Had the State been successful in this effort, it would have been unnecessary to go forward and meet the remaining two-prong aspect of the *Graham* test. Indeed, the State offered virtually no evidence at trial to establish that Green could appreciate the nature of his conduct or control it at will. Instead, the State relied solely on testimony that Green was not suffering from mental incapacity at the time of the offense, a theory which was totally demolished by the strength of the defendant's insanity proof at trial.

Nor does the State appear to take the position before this Court that the defendant was not suffering from a mental disease or defect. Instead, the State argues that the nature of the defendant's condition was not sufficient to meet the remaining two-prong test of *Graham.* First, the State says, evidence that the defendant fled from the scene of the crime and hid the weapon involved in the shooting proves that he knew the wrongfulness of his act. The most obvious response to this argument is that the record shows only that the defendant left the scene at some point after the shooting and that Officer Wilcox's revolver was never recovered; neither of these facts establishes beyond a reasonable doubt that the defendant was attempting to conceal his identity or complicity from police, or that he otherwise was able to appreciate the wrongfulness of what he had done. In-

deed, his conduct after the shooting may have been "controlled" by the same delusions or hallucinations which the medical experts determined to have precipitated the shooting in the first place. Nor is Green's reluctance to discuss the incident with police officers determinative of this question, given testimony (summarized above) that such reluctance to go beyond superficial topics of conversation into areas of the subject's mental disturbance is symptomatic of paranoid schizophrenia.

But even if it were conceded that by his post-event behavior Green evidenced some appreciation of the wrongfulness of his conduct, the record is wholly devoid of any evidence that at the time he shot Wilcox, Green was able to conform his conduct to the dictates of law. The State's only argument in response to overwhelming evidence of Green's incapacity in this respect is that his failure to react violently toward *other* police officers with whom he came into contact proves that he was able to conform his conduct to the law with respect to Officer Wilcox. Thus, the State reasons, his action in killing Wilcox must be considered willful, malicious, and premeditated. This argument, of course, not only begs the question (that is, whether under this analysis any initial violent behavior could ever be the product of insanity), but it also ignores the nature of paranoid schizophrenia, as described by experts in this and other cases. *See, e.g., Sampson v. State, supra.*

Moreover, there is no evidence of remission in this instance, as there was in *Forbes v. State,* 559 S.W.2d 318 (Tenn.1977). The clear implication of *Forbes* is that medication or other treatment is necessary to achieve remission in the schizophrenic patient; yet here there is no dispute that the defendant, though psychotic and formerly diagnosed as needing medication, was not receiving treatment at the time of the offense. Indeed, hospital and court records demonstrate that it required many months of in-hospital treatment before Green's schizophrenia was finally considered to be in remission.

Nor is this case like *State v. Patton,* 593 S.W.2d 913, 916 (Tenn.1979), where the expert testimony established only what amounted to maladjustment on the part of the accused; or the case of *Edwards v. State,* 540 S.W.2d 641 (Tenn.1976), where the evidence of mental disease or defect was simply not compelling.

The State correctly points out that a jury is not bound by expert testimony, even when it is non-conflicting. *Brooks v. State,* 489 S.W.2d 70 (Tenn.Cr.App.1972). However, the Tennessee Supreme Court has clearly delineated what proof the State must produce to meet and overcome evidence of insanity:

> Th[e] burden can be met by the state through the introduction of expert testimony on the issue [of insanity], or through lay testimony where a proper foundation for the expressing of an opinion is laid, or through the showing of acts or statements of the petitioner, at or very near the time of the commission of the crime, which are consistent with sanity *and inconsistent with insanity.*

*Edwards v. State,* 540 S.W.2d 641, 646 (Tenn.1976) (emphasis added). In this case, although the acts of the defendant at or near the time of the killing were arguably "consistent with sanity," quite obviously they were not also "inconsistent with insanity." Under the *Edwards* rule, the State has failed to meet its burden of establishing sanity, and thus "the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Rule 13(e), Tennessee Rules of Appellate Procedure. Applying Rule 13(e), we have no choice but to set aside Green's conviction.

The judgment of the trial court is reversed, and the case is remanded for further proceedings in compliance with T.C.A. § 33–709.

WALKER, P.J., and BYERS, J., concur.