**STATE of Tennessee, Appellee,**

v.

**Otis Junior OVERBAY, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Oct. 28, 1993.

Stephen M. Wallace, Atty., Office of the Public Defender, Blountville, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Kimbra R. Spann, Asst. Atty. Gen., Nashville, and R. Jerry Beck and Phyllis H. Miller, Asst. Dist. Attys. Gen., Blountville, for the State.

## OPINION

WADE, Judge.

A jury convicted the defendant, Otis Junior Overbay, of first degree murder. The trial court imposed a life sentence.

In this appeal, the defendant presents as his single issue for review whether the evidence was sufficient to establish his sanity at the time of the offense. We have determined that the state failed to meet its burden in this respect. We reverse the judgment of the trial court and remand this cause for further proceedings.

On the afternoon of May 31, 1990, the victim, Sullivan County Deputy Glayton Parker, was shot and killed as he attempted to serve an order of capias on the defendant. Some months earlier the defendant had been charged with criminal trespass, a misdemeanor. During the course of that proceeding, the defendant was ordered to undergo an evaluation by the Bristol Regional Mental Health Center to determine whether the defendant was competent to stand trial. Some three months before the shooting, the defendant was referred to Lakeshore Mental Health Institute for an inpatient evaluation. When the defendant failed to appear as required, the court issued the capias that Deputy Parker had attempted to serve on the date of the shooting.

The undisputed evidence is that the defendant shot the victim with a high-velocity rifle at a distance of less than two feet. Allen Walker, a witness for the state, testified that he observed the victim park in the defendant's driveway and initiate a conversation with the defendant, who stood on his front porch. As the victim made his approach, the defendant, who was carrying a rifle in his left hand, entered his residence and closed the door. The victim pounded on the defendant's front door in an apparent attempt to gain entry. The defendant opened the door and fired the fatal shot. The victim, although armed with a handgun, never removed the weapon from his holster.

Walker first called out then watched as the defendant went next door to his father's house, returned, and then went back. The witness observed as the defendant placed his weapon, a 30/30 rifle, in the trunk of his father's automobile. Walker described the defendant's general conduct as anti-social and withdrawn; he characterized the defendant's behavior earlier in the day as consistent with his usual demeanor.

During the course of the investigation, the rifle was recovered from the trunk of the automobile. Stipulated testimony established that two shots had been fired from the weapon. One of the expended shells was found at the defendant's residence and the other shell was found in the defendant's pocket.

Michael Horne lived nearby. After he heard a gunshot, he saw the defendant looking around the corner of his father's residence. The defendant had a weapon in his hand. When the defendant saw Horne, he said, "Hello, Mike."

Officer David Quillen of the Kingsport Police Department was among the first on the scene. He testified that the front door of the defendant's residence was open and the victim, who had no pulse, was lying in the doorway. When Police Officer Ralph Cline arrived at the scene, he observed the defendant talking with his father. He acquired the keys to the elder Overbay's car trunk and took possession of the rifle.

The defendant was not in custody when Detective J.W. Sampson, the ranking officer, arrived at the scene. He watched as Officer Nelson Quillen ordered the defendant to the ground with his arms spread. The defendant was able to follow Quillen's instructions; when asked if anyone else was in his residence, the defendant answered in the negative. The defendant was handcuffed and, according to Officer Quillen, appeared to be aware of his surroundings.

A neighbor saw the defendant being taken to the patrol car. She recalled his statement, "You are breaking my arms, I'm going to sue you." This witness was also aware of some of the defendant's prior erratic behavior. She testified that she had seen the defendant riding his bicycle backwards about a month before the shooting.

Kingsport Police Officer Lowell Atkins observed as the defendant was taken into custody and transported the defendant to jail. He described the defendant's speech as coherent yet testified that the defendant acted oddly when asked routine questions such as his name and date of birth. He stated that the defendant did not answer verbally but would reply by counting to five on his fingers. After the defendant was placed into a holding cell for an interview, he would answer officers' questions by either counting to five on his fingers or slapping the wall five times. He used hand signals to indicate his request for a cigarette and use of a telephone. When allowed to make a telephone call, the defendant asked for cigarettes, stated that he feared for his life at the jail, and claimed that his rights had been violated.

Robert Denny, a TBI agent, questioned the defendant from approximately 5:20 until 6:00 P.M. on the date of the shooting. Although he acknowledged that the defendant exhibited erratic behavior by making hand motions in response to questions rather than verbalizing his responses, Agent Denny stated that the defendant was able to follow instructions. He described the apparent disarray inside the defendant's residence as "cluttered."

Charles Richard Cain, an inmate who had shared a cell with the defendant in the Sullivan County Jail in January of 1990, stated

that the defendant was upset about his incarceration on this prior occasion and had threatened to shoot the next person who attempted to make a future arrest. On cross-examination, Cain, who had been convicted of a conspiracy to possess more than 70 pounds of marijuana, admitted that he did not report the threat at the time it was purportedly made.

No expert witnesses testified for the state on the issue of the defendant's sanity. None of the lay witnesses were able to render an opinion about the defendant's sanity. Certain of the evidence, however, including that of witnesses Joseph Strickler and Mark Baird, who were employees at the Sullivan County Jail, indicated that the defendant understood directives on the date of the crime and could follow instructions.

Terry Frye, a Bristol attorney who had represented the defendant on the earlier criminal trespass charges, described the defendant as "totally irrational":

> I wasn't able to reason with him, and the end result of it was he said he didn't want any attorney to represent him, he wanted to represent himself. . . . I never was able to communicate with him. After that first meeting, I don't think we passed more than a couple of words between us. I would go and see him in the holding cell in the jail. He would look up in the air, just stare up in the air. He would start counting. He would laugh for no apparent reason whatsoever, just all of a sudden . . . start laughing in a very strange tone. He would normally not even face me, not even look at me, not respond to anything I said. . . .
>
> He made the allegation that there was a conspiracy by the state, by the judge, by myself, law enforcement and everybody else against him. Once again, no facts, no details, but we could not conduct a trial.

Frye testified that he went to the jail to talk to the defendant sometime just after the shooting. The defendant, on suicide watch, was uncommunicative. Naked, the defendant turned his back to Frye and Gale Flanary, an attorney with the public defender's office who participated in the attempted interview. The defendant drooled from his mouth and tapped his foot intently on the ground. He beat his fists against the wall and gave no response to direct questioning. Frye, who said he had dealt with a number of people who had been adjudged insane, testified that the defendant's "behavior was more bizarre, and more aberrational than anyone I have ever represented in my career." [1]

JoAnn Smith, the defendant's younger sister, testified that her brother had a long history of mental illness. Because of his inability to care for his three minor children, he had lost their custody by action of the Department of Human Services. Often, the defendant drove his vehicle with a female mannequin in the passenger seat. He talked with the mannequin and claimed that "they" would not bother him if he had a witness. Ms. Smith testified that when his car broke down, the defendant rode a bicycle, still accompanied by the mannequin. Sometimes he would ride on traffic-congested streets, much to the distress of local law enforcement officers. Occasionally, he would ride his bicycle backwards. Ms. Smith stated that the defendant would "listen" to his food, and sometimes throw it away. He also "listened" to his mail, then put it back into the mailbox. The defendant constantly complained that the Russians were after him and that people stole from him; he wanted to convert a septic tank into a bomb shelter and buried his money in a milk can. Ms. Smith described the defendant, who had not worked in several years, as insane.

Records of the Social Security Administration dated February 3, 1972, characterized the defendant as an "ambulatory borderline psychotic with a strong paranoid underlay." The medical report acknowledged the possibility that the defendant was capable of acting "destructively towards himself and/or others."

Dr. A.K.M. Fakhruddin, employed by the state at the Middle Tennessee Health Institute, performed an evaluation on the defendant in conjunction with an evaluation team made up, in part, of a psychologist, a social

---

1. The defendant was never brought to trial on the criminal trespass charge.

worker, and a nurse. The defendant's medical history included a report from another psychiatrist who had found the defendant to be incompetent to stand trial only a few weeks after the shooting; the defendant was described as "psychotic" at that time. Over a year and one-half later, during which the defendant was under continuous treatment, he was still deemed "incompetent." Dr. Fakhruddin delayed any evaluation on the sanity issue until February of 1992, when it was determined that the defendant was competent for testing. Dr. Fakhruddin explained that until the defendant had been determined "competent to stand trial," there was no reason to evaluate his sanity at the time of the offense.

After two months of observation, Dr. Fakhruddin determined that the defendant suffered from schizophrenia, paranoid type:

> [T]here are distortions of realities, there are schizophrenic; and a paranoid characteristic, they have delusions of persecution, which means a person has fixed false belief, persecutions that feel that somebody might be hurting him, or delusions of grandeur ... that you might be very rich.... Or, he can have hallucinations, hearing voices, or hearing things like he was listening to the meal....

Dr. Fakhruddin testified that, despite the illness, a paranoid schizophrenic would have ordinarily been able to smoke a cigarette, make a telephone call, and generally follow the directives of police officers. He described the defendant as having chronic schizophrenia, a type which would be expected to last for a long period of time. Testing indicated that the defendant, an illiterate, had an IQ of either 75 or 76, a mild mental retardation. As a schizophrenic, the defendant, in his opinion, distorted reality; that, in combination with his low intelligence, deprived the defendant from either appreciating the wrongfulness of his conduct or conforming that conduct with the requirements of law. The evaluation team involved in the defendant's treatment concurred in this assessment. Dr. Fakhruddin, who described his role as "working for this court ... to give [his] honest opinion," discounted the possibility of malingering based primarily upon the defendant's long history of delusional behavior, a prior diagnosis of schizophrenia, and the defendant's failure to accept treatment.

Dr. Sam Craddock, a clinical psychologist also employed by the state, played a major role in the evaluation. After a commitment proceeding, he first saw the defendant on July 12, 1990. He observed the defendant for a 30–day period and he determined, in conjunction with others, that the defendant was not at that time competent to stand trial. Dr. Craddock described competence as being able to "talk in a reasonable fashion," communicate with his legal counsel, and discuss his mental illness in relation to an insanity defense. The defendant was treated for "severe irrational behavior" for well over a year. By October of 1991, after a continuous period of hospitalization, a determination was made that the defendant had made sufficient progress to stand trial. It was Dr. Craddock's opinion that the defendant was not a malingerer. He stated, in fact, that the defendant adamantly maintained that he had never been afflicted by any mental illness.

In February of 1992, Dr. Craddock diagnosed the defendant as afflicted with a chronic paranoid schizophrenia; he concluded that the defendant met the legal test of insanity at the time of the shooting. Due to this mental illness, he held the firm opinion that the defendant earnestly believed that he had acted in self defense, unable to appreciate the wrongfulness of the act—one of the two possible means for a declaration of insanity. Dr. Craddock noted, however, that he was less certain about the second alternative: whether the defendant was unable to conform his behavior; he declared "neutrality" as to the defendant's ability to conform to the requirements of law. He was, however, positive in his assessment that the defendant did not appreciate the wrongfulness of his act, which, standing alone, is sufficient to qualify for an insanity defense.

Rebecca Smith, a psychiatric social worker at the Middle Tennessee Mental Health Institute for approximately 20 years, also participated in the defendant's evaluation. As a part of her responsibilities, she researched the defendant's social history. The defendant was hospitalized under the care of the

treatment team for over a year and a half. Ms. Smith treated the defendant several times a week during that time. She related that initially the defendant refused to talk to the team, would gesture with his fingers, and turn his back; he thought that he had been kidnapped and was at the hospital to have his teeth pulled. Generally uncooperative, he appeared to be disoriented, did not know the whereabouts of his room, and often urinated in the hallway and other inappropriate places in the hospital. She stated that the defendant believed that the medication the treatment team prescribed was poisonous. By virtue of her own observations and the statements the investigative officers had made about the defendant during and after his arrest, Ms. Smith believed that the defendant met the legal test of insanity on the date of the offense.

To sustain a contention that the evidence is insufficient, the defendant must show that a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Tenn.R.App.P. 13(e). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom.

Moreover, the law presumes the sanity of one accused with any crime. *Brooks v. State*, 489 S.W.2d 70, 72 (Tenn. Crim.App.1972). If any evidence introduced during the course of the trial, however, creates reasonable doubt on the issue, the burden of proof shifts from the defendant to the state. The state must then establish the defendant's sanity beyond a reasonable doubt. *Graham v. State*, 547 S.W.2d 531, 544 (Tenn.1977). Under that circumstance, sanity becomes an essential element of the crime. *State v. Clayton*, 656 S.W.2d 344, 346 .(Tenn.1983). Absent proof of sanity beyond a reasonable doubt, the law clearly entitles the defendant to a verdict of not guilty by reason of insanity.

Here, the defendant was examined by a treatment team at a state institution. The team was unanimous in its conclusion that the defendant was insane at the time of the offense. That evidence shifted the burden to the state on the issue of insanity. As is altogether permissible, the state relied entirely upon the lay testimony in an attempt to establish by sufficient proof that the defendant was sane at the time he shot the victim:

> "Th[e] burden can be met by the state through the introduction of expert testimony on the issue [of insanity], or through lay testimony where a proper foundation for the expressing of an opinion is laid, or through the showing of acts or statements of the petitioner, at or very near the time of the commission of the crime which are consistent with sanity and *inconsistent with insanity*."

*State v. Green*, 643 S.W.2d 902, 913 (Tenn. Crim.App.1982) (emphasis in original) (quoting *Edwards v. State*, 540 S.W.2d 641, 646 (Tenn.1976)). A jury is not required to accept the testimony of a psychiatrist on the issue of sanity to the exclusion of lay testimony or to the exclusion of evidence of the actions of the defendant which are inconsistent with sanity. *Edwards*, 540 S.W.2d at 647. The test of sanity was established in *Graham;* the *state* must show by sufficient proof "(1) that at the time of the offense the defendant was not suffering from a mental disease or defect, *or* (2) if he was, that his illness was not such as to prevent him from knowing the wrongfulness of his conduct *and* from conforming his conduct to the requirements of law." *Green*, 643 S.W.2d at 912 (emphasis added).

Although the state argues persuasively that lay testimony and a portion of that provided by Dr. Craddock might marginally support a finding that the defendant has the ability to conform his conduct with the requirements of law, the *Graham* standard clearly requires more. The proof here established that the defendant had a mental illness. The state concedes that point. In fact, there is no relevant evidence to the contrary; even in its most favorable light, the actions, words, and deeds of the defendant, even as described by the state's witnesses, were consistent with the medical diagnosis. The defendant had clearly suffered from a mental disease for years prior to the time of the offense and did so for months

thereafter. Of greater significance is that there was unchallenged medical testimony that the defendant was incapable of understanding or appreciating the wrongfulness of his conduct.

■ In *Green*, the lay evidence provided by the state was not inconsistent with the medical testimony presented in that case. To qualify as sufficient rebuttal on this issue, the state's proof must not only be consistent with sanity but inconsistent with insanity. In this instance, the medical experts testified that the conduct of the defendant in the presence of neighbors and police officers immediately after the crime was perfectly consistent with their insanity diagnosis. After a careful review of the record, and more specifically the pertinent testimony of Agent Denny, three neighbors, Detective Sampson, Officers Nelson and Atkins and others, we have found nothing to suggest any conflict between their observations and the conclusions of the medical evaluation team that the defendant was insane. *See State v. Patton*, 593 S.W.2d 913, 916 (Tenn.1979).

As in *Green*, the acts of this defendant on the date of the offense qualified as consistent with sanity but not inconsistent with insanity. Following police directives, asking for cigarettes, responding to questions, and placing the rifle into the trunk of his father's car did not, according to all of the medical testimony, indicate that the defendant acted in a manner at odds with his diagnosis. None of the lay witnesses for the state had any long period of association with the defendant or any particular insight into his mental health. None were able to render an opinion on the sanity of the defendant. Certainly, there were no facts establishing any foundation to support such a lay opinion. *See* dissent, *State v. Jimmy W. Hammock*, 867 S.W.2d 8 (Tenn. Crim.App.1993).

Stated simply, the state failed to establish sanity by either of the methods permissible under the *Graham* test. Accordingly, the evidence of sanity, even viewed most favorably to the state, is insufficient to support the findings by the trier of fact beyond a reasonable doubt. Tenn.R.App.P. 13(e).

This type of issue is proving to be increasingly difficult for our juries.[2] In a case involving a demonstrated claim of insanity on the part of any defendant, the responsibilities of not only the jury, but the trial judge and the reviewing courts are particularly onerous. *See State v. Vence Edward Mason*, No. 02C01–9201–CC–00004, 1993 WL 270614 (Tenn.Crim.App., Jackson, July 21, 1993). The law requires the exoneration of this defendant; his actions are legally excusable despite his obvious responsibility for the senseless death of this innocent victim. In a similar instance, this court observed that: "[t]he duty of this jury to find the defendant not guilty by reason of insanity proved to be too difficult a task...." *State v. Dallas Clark*, No. 834, 1989 WL 15678 (Tenn.Crim.

2. An article appearing in the *Knoxville News–Sentinel* on April 5, 1993, provided, in part, as follows:

Jurors everywhere, fearful of rising crime and worried that dangerous criminals will go free, are reluctant to find defendants not guilty because of insanity—even when the most bizarre crimes have been committed, experts say.

"Finding someone not guilty because of their mental state is being seen as akin to getting off scot-free," said Abbe Smith, deputy director of the Criminal Justice Institute at Harvard University Law School. "It's tied directly to the fear of crime."

\* \* \* \* \* \*

A study of 49 counties in eight states—California, Georgia, Montana, New Jersey, New York, Ohio, Washington and Wisconsin—showed that between 1976 and 1987, 1 percent of the pleas in felony cases were insanity defenses, according to the American Academy of Psychiatry & the Law. Of those nearly 9,000 cases, 26 percent of the defendants who entered such pleas were acquitted, and only 7 percent of those acquittals were by a jury.

\* \* \* \* \* \*

Actually, defendants acquitted on insanity pleas spend about as long in mental institutions as they would have spent in prison had they been convicted, according to Henry J. Steadman, president of Policy Research Associates, which conducted the eight-state study on insanity pleas.

Steadman found that the median length of confinement for defendants acquitted by reason of insanity in murder cases was 1,737 days, or 4.7 years. The median length of confinement for defendants found guilty of murder was 1,828 days, or five years.

"You don't beat a rap by pleading not guilty by reason of insanity," Steadman said. "Typically, they end up in high security institutions that are not pleasant places to be."

App., Knoxville, February 24, 1989), *perm. to appeal denied,* (Tenn.1989). That assessment fits these circumstances as well.

In summary, there is insufficient evidence in this record to rebut the proof of the defendant's insanity at the time of this offense. Accordingly, the judgment of the trial court must be reversed. The cause is remanded for further proceedings regarding involuntary commitment in compliance with Tenn.Code Ann. § 33–7–303.

SUMMERS, J., files a separate concurring opinion.

JOHN K. BYERS, Senior Judge, concurs.

SUMMERS, Judge, concurring.

I must necessarily agree with the majority in the present case. However, in doing so, I stand firmly by my dissent in *State v. Jimmy W. Hammock,* 867 S.W.2d 8 (Tenn.Crim.App. 1993).

In *Hammock,* the state called several lay witnesses who had known the defendant for years. One witness had known the defendant all of his life. These witnesses gave strong, convincing testimony concerning the defendant's sanity. I still feel that based upon the state's lay testimony, the jury in *Hammock* properly found the defendant sane beyond a reasonable doubt.

The case *sub judice* is clearly distinguishable. The state's evidence consistent with sanity and inconsistent with insanity is slim. Based upon a reading of this voluminous record, I doubt if the evidence could get any stronger. The defendant has been a paranoid schizophrenic for many years, and his aberrant acts and insane behavior were well known. The state's forensic mental health team was unanimous in determining that this defendant was insane at the time of the commission of the offense. I realize from personal experience the frustrations involved and the emotions this case must have had, but I simply do not think that the lay testimony was strong enough to meet the state's burden of proving Overbay's sanity.

I still stand on the proposition that the state may establish a defendant's sanity by the use of expert testimony, by lay testimony, or both, by showing that the defendant's behavior was consistent with sanity and inconsistent with insanity. Simply put, in the present case, the state had no such evidence.

I would hope that in ruling as we have, the mental health officials will read this entire record. They must understand that this defendant is someone who needs to be treated, watched, guarded, and scrutinized carefully in a secure facility for the criminally insane. I have no doubt in my mind that after the district attorney general files the proper petition pursuant to T.C.A. § 33–7–303 and § 33–6–104, the court will judicially commit this defendant. This defendant is a person who has committed homicide, and poses a substantial likelihood of serious harm to others and possibly to himself. After reviewing this record and defendant's mental health history and evaluations, I do not see how he will ever be releasable into society as we know it. Certainly this is a case for involuntary commitment, and if the situation ever arises, judicial discharge review should be mandatory pursuant to T.C.A. § 33–6–110.

This case is a tragedy any way you look at it. A law enforcement officer was killed doing his job. This defendant should have been hospitalized years ago. It took a year and a half before the psychiatrists and psychologists could even find him competent to stand trial. It seems that our system lost him somewhere between the cracks. It is my sincere hope that the Commissioner of Mental Health and Mental Retardation never lets Mr. Overbay slip between the cracks again. I would hope that in the years to come, Deputy Parker's violent death is not forgotten.

Both sides have done an excellent job in prosecuting and defending this tough case. These cases are rare, but they do unfortunately occur. Sometimes juries are swayed by passion, emotion, and public sentiment. We understand that, and we appreciate that human element of our criminal justice system. But, when asked to review these difficult cases, we would be irresponsible if we glossed over hard evidence that a defendant meets all three prongs of the insanity test.

*See Graham v. State,* 547 S.W.2d 531 (Tenn. 1977).

I must concur with Judge Wade's opinion.