# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### OCTOBER SESSION, 1997

FILED

December 30, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | No. 02C01-9702-CR-00082 |
| Appellee | ) | |
| | ) | SHELBY COUNTY |
| vs. | ) | |
| | ) | Hon. JOSEPH B. DAILEY, Judge |
| JAMES E. HATHAWAY, | ) | |
| | ) | (Felony Murder and |
| Appellant | ) | Especially Aggravated Robbery) |

For the Appellant:

**Brad S. Tisdale**
642 Washington, Suite 1
Memphis, TN 38105

**Charles Waldman**
147 Jefferson Ave.
Suite 1101
Memphis, TN 38103

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**Kenneth W. Rucker**
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493

**William Gibbons**
District Attorney General

**Terrell L. Harris and
David C. Henry**
Asst. District Attomeys General
Criminal Justice Complex, Suite 301
201 Poplar Street
Memphis, TN 38103

OPINION FILED: _____

AFFIRMED

**David G. Hayes**
Judge

## OPINION

The appellant, James E. Hathaway, appeals his jury convictions for the crimes of especially aggravated robbery and felony murder. At the conclusion of the penalty phase of the trial, the jury imposed a sentence of life imprisonment without the possibility of parole for the felony murder conviction. The Criminal Court of Shelby County sentenced the appellant to twenty-five years for the especially aggravated robbery conviction, ordering that this twenty-five year sentence run consecutively to the appellant's life sentence. On appeal, the appellant raises the following issues:

> I. Whether the trial court properly reseated Juror Ward after concluding that the defense's exercise of a peremptory challenge was racially motivated;
>
> II. Whether the State established the appellant's sanity beyond a reasonable doubt; and
>
> III. Whether the trial court properly prohibited the defense's expert witness from testifying regarding the diagnoses of non-testifying physicians and the effects of cocaine on an individual exhibiting a history of seizure disorder.

After a thorough review of the record and the law applicable thereto, we affirm the judgment of the trial court.

### Background

The proof at trial revealed that, in December of 1993, the victims in this case, Elbert Dan Swartz and his wife, Maxine Swartz, owned and operated Keyport Self-Storage, a mini-storage facility in Memphis. The couple's residence was attached to the office of the business. Mr. Swartz was a sixty-one year old retired Memphis police officer.

2

On December 14, 1993, as Mr. Swartz was locking the office door at closing time, the appellant and a co-defendant, each carrying a handgun, entered the business. Mrs. Swartz, who was in the residence area, heard the beeping sound which indicated that the office door had been opened. Seconds later, the appellant and the co-defendant, Abraham Galmore, entered the Swartzs' apartment. The appellant grabbed Mrs. Swartz and demanded money, while Galmore held a gun to Mr. Swartz's head. Mr. Swartz replied that they did not have any money. The appellant then began kicking and shoving Mrs. Swartz toward the bedroom, where he forced her onto her knees. Pointing his weapon at the back of her head, the appellant informed Mr. Swartz that, if he didn't produce some money, he would "blow [Mrs. Swartz's] brains out." After hearing his wife's pleas for compliance with the intruder's request, Mr. Swartz took two bank bags from the bedroom. The appellant remarked, "Ms. Maxine, I sure hate to do this to you," and then shot Mrs. Swartz in the back of the head.[1] Galmore retrieved a knife from the kitchen and the two men took turns stabbing the already wounded Mrs. Swartz in the throat.

The perpetrators then returned to Mr. Swartz and shot him in the back of the head. As the assailants argued over who would stab Mr. Swartz, one held Mrs. Swartz by the back of the head, forcing her to watch the execution of her husband.[2] The two men then pillaged through their victims' personal belongings, taking jewelry, Mr. Swartz's father's watch, money, and various handguns. Before leaving the apartment, the appellant grabbed Mrs. Swartz by her hair and jokingly remarked to his companion, "Don't waste another bullet on her. She's already dead too." After the two assailants left, Mrs. Swartz crawled to the telephone in the living room and dialed 911. Concerned that her attempt was unsuccessful, she contacted her granddaughter who also notified 911.

---

[1] At trial, Mrs. Swartz advised that, prior to this incident, she and her husband had employed the appellant to perform odd jobs, including "detailing" their automobiles. She continued that, on numerous occasions, her husband had loaned money to the appellant and that the appellant was welcomed in their home.

[2] Regarding the stabbing, the appellant stated "I want my share of this."

Paramedics arrived at the scene at approximately 5:59 p.m, and discovered Mr. Swartz laying face down in a pool of blood. He was pronounced dead at the scene. Mrs. Swartz was in shock from the loss of blood. The paramedics, believing her condition to be critical with a high risk of death, inquired as to whether Mrs. Swartz could identify her assailants. She replied "James" and a last name indiscernible to the paramedics. Before being transported to the hospital, she was able to state, "James Hathaway did it."

After fleeing the scene, the appellant and Galmore went to the apartment of Roy Ballard.[3] Ballard observed that the appellant was carrying two handguns and Galmore was armed with a knife. Galmore handed the knife to the appellant who began washing off what appeared to be blood from the knife. Ballard noted that the appellant had blood on his person and clothing. Ballard also observed that the two men "had a lot of money." After leaving Ballard's apartment, the appellant proceeded to the Sun Inn Motel, where he registered in his own name. The appellant then purchased $250.00 worth of crack cocaine which he smoked. At 11:00 a.m. the following morning, the appellant telephoned his mother and told her that he had done something awful. He was then taken to the police station by his mother and her husband.

At the police station, the appellant appeared normal and was willing to talk with police officers. After being advised of and signing a waiver of rights, the appellant gave a statement in which he admitted that he had shot Mr. Swartz. He stated that "a man he only knew as Greg" accompanied him during the "robbery/murder."[4] Narrating the events of the prior evening, the appellant stated

---

[3]Ballard also related that the appellant and Galmore had visited at his apartment earlier that afternoon and that he had overheard the two planning a robbery or in their terms, "going to make a sting."

[4]"Testimony revealed that "Greg" was Abraham Galmore's nickname. Prior to the appellant's trial, Galmore was convicted of criminally negligent homicide and especially aggravated robbery. He was sentenced, as a career offender, to sixty-six years in the Department of Correction.

4

that "Greg put a pillow to Dan's head and told [the appellant] to shoot. And [the appellant] shot once. Greg then shot Dan two more times. . . . Greg came out of the bedroom and went in the kitchen and got a knife." He stated that "Greg" had stabbed Dan. The appellant recalled that "[he] took Maxine back into the bedroom where Dan was. [The appellant] advised that he did not shoot or stab Maxine." At the conclusion of this statement, the appellant telephoned his parents and live-in girlfriend, Stella Martin.

After completing his telephone calls, the appellant, again, voluntarily waived his rights, and stated that he wished to make a second statement. The appellant related that

> [he] went to Dan's to go borrow some money. [He] got out and went inside and Dan opened the door for me. Greg was still in the truck when I got out. When I got inside he came in like before that door closed. He was inside in the back of me. He, Greg, had the gun in his hand; and he said this is a robbery. At that point, Greg took Dan to the bedroom and told him to sit down. Greg told Maxine to get in here, and she was talking real drowsy like. . . . Greg asked him, where is the money. Dan told me it was under the bed, and I got it out. Dan kept asking me, why am I doing this. I'll give you the money if you ask me for it. From there Greg grabbed a pillow, put it to the back of Dan's head, handed me the pistol and said shoot. And I shot him once. Him and Dan got to fighting, and after I shot him, I gave Greg the gun back. I went in the living room and got the money out of the drawer., After I got the money, I heard the shots. . . . Greg was going in the kitchen. He came out the kitchen with a knife. . . . Then Greg went back in the room and Dan and Greg started scuffling again. Greg started stabbing Dan with a knife. Then he was just stabbing and Dan was kicking.

The appellant again denied stabbing or shooting Maxine Swartz. However, he stated "There ain't no excuse for doing what I did. I'm sorry, but it won't change anything."

Testifying in his own defense, the appellant related that, on the date of these crimes, he had been smoking crack cocaine earlier in the day. He was later joined by Galmore at Ballard's apartment where the two continued to use cocaine. The appellant testified that he had no recollection of the events transpiring after he left Ballard's apartment until the next morning when he awoke in the hotel. The

5

appellant revealed that, in 1984, he suffered a gunshot wound to the head. As a result of this incident, the appellant's equilibrium was affected and, subsequently, he underwent surgery, a labyrinthectomy, to correct this problem. The appellant related that the bullet is still lodged in the back of his skull. After this injury, the appellant began suffering seizures, for which he takes 100 milligrams of Dilantin per day. Moreover, in order to obtain relief from the pain suffered from this injury, he began using illegal drugs, including heroin, cocaine, crack, and PCP.[5]

Dr. Marsha Little, a clinical psychologist with a speciality in neuropsychology, performed an evaluation of the appellant.[6] Testifying on his behalf, she opined that the appellant has "difficulty in abstract reasoning, social judgment, [and suffers from] impulsivity."[7] Dr. Little diagnosed the appellant as mentally ill and suffering from an organic mental disorder resulting from damage to the brain caused by structural insult. Specifically, she stated that, as a result of the gunshot wound, the appellant endured impairment of the functioning of the front temporal lobes of the brain. In sum, Dr. Little concluded that on the evening of December 14, 1993, the appellant was unable to control his impulses.

In rebuttal of Dr. Little's diagnoses, the State called Drs. John Whirley and Wyatt Lee Nichols, both clinical psychologists. Dr. Whirley conducted an interview of the appellant during which the appellant indicated a lack of memory of the criminal episode. Acknowledging that the appellant was admittedly "high" on cocaine at the time of the offense and that "a drug dependant state can affect memory functioning," he determined that, at the time of the offense, the appellant

---

[5] On cross-examination, however, the State revealed medical reports from 1991 which indicated that the appellant began his abuse of illegal substances at the age of thirteen.

[6] At trial, "neuropsychology" was defined by Dr. Little as a study of the relationship between the brain and behavior. It includes the study of individuals who have suffered brain trauma "and how they function in their daily world."

[7] Dr. Little defined "impulsivity" as the inability to think before one acts or makes statements.

"was able to appreciate the wrongfulness of the behavior; and he was able to control his behavior or conform his behavior to the requirements of the law." Although Dr. Whirley admitted that the appellant has a substance abuse history of twenty-five years and that the appellant may be suffering from depression, he concluded that these observations are not "remarkable or a mark of insanity. It's actually a mark of some reality to be depressed when you're facing these kinds of charges. But I saw no evidence of psychosis which is the most common thing that we would expect if one had access to insanity." With regard to Dr. Little's conclusion that the appellant suffered from impulsivity, Dr. Whirley countered that "[h]e may be impulsive, but I think he's been impulsive since he was small." He explained that impulsivity is "more of a symptom or a personality trait" and not a diagnosis or a mental disorder. Moreover, impulsivity "doesn't take away one's ability to appreciate the wrongfulness of behavior or to conform to the behavior to the law." Based upon the circumstances of the criminal episode, Dr. Whirley found evidence of planning which negated the suggestion of an impulsive act. Furthermore, he could not confirm Dr. Little's diagnosis of organic brain damage.

Dr. Nichols also testified as to the appellant's mental state. Dr. Nichols conducted two mental examinations of the appellant. Dr. Nichols determined that the appellant was competent to stand trial and that the appellant did not suffer from a mental illness. Regarding Dr. Little's diagnosis of impulsivity, Dr. Nichols responded that, although

> he might have impulse control problems. . . that really doesn't mean much. Most people with an antisocial personality . . . that's one of the cardinal symptoms of that - - impulse control problems. Most people with chronic chemical dependency histories, . . . it's not unusual at all for him to have impulse control problems. And when he's intoxicated or high, then he's going to more likely have trouble with his impulses. I mean, that's true for anybody as a general rule.

Regarding the present offenses, Dr. Nichols determined that they were goal directed, and not an impulsive act. In summary, he concluded that "[the appellant]

was not out of touch with reality or distorting reality past anything that would be accounted for by being intoxicated. . . . His behavior was still goal oriented."

Based upon this evidence, the jury convicted the appellant of felony murder and especially aggravated robbery.

## I. Batson Challenge & Reseating of Juror Ward

During voir dire, the defense exercised the seventh of their eight peremptory challenges against prospective juror Carol Ward.[8] Ms. Ward was discharged as a juror and excused from the courtroom. The State then objected to Ms. Ward's removal as being a possible violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986) (holding that peremptory challenges may not be exercised in a discriminatory manner. A jury out hearing was then held during which the defense provided the court with several race-neutral explanations for the exercise of the peremptory challenge against Ms. Ward. Specifically, defense counsel noted, as to Ms. Ward, that she "appeared. . .to be. . . strongly in favor of the death penalty," she appeared to have agreed with another juror's doubts about an insanity defense, her home had been burglarized, and her ex-husband had been addicted to cocaine. Additionally, prior to exercising the challenge, defense counsel consulted with the appellant who indicated that, during the voir dire process, he felt that Ms. Ward was staring at him intently, and that he felt animosity emanating from her. Finally,

_____

[8]The appellant is an African American male. Ms. Ward is a Caucasian female. The reference from the record is that all of the seven peremptory challenges exercised by the defense were directed toward Caucasian members of the venire. Moreover, six of these seven prospective jurors were female. J.E.B. v. Alabama, 511 U.S. at 127, 114 S.Ct. at 1419 (1994), extended the Batson rationale to gender discrimination.

Although not raised by either party, the fact that the basis of juror exclusion in the present case is that the juror is Caucasian is of no consequence. The Batson principle is not limited to the exclusion from juries of historically oppressed minorities. See J.E.B. v. Alabama, 511 U.S. at 127, 114 S.Ct. at 1419. Batson held that equal protection guaranties forbid the State in a criminal prosecution to use peremptory challenges to exclude potential jurors solely on account of their race or on the assumption that because of their race they will be unable to be impartial. This protection applies equally to Caucasians and African-Americans.

defense counsel advised the court that it was the combination of these reasons that supported their exercise of the peremptory challenge.

The trial court, before ruling on the State's objection, interviewed defense counsel as to its prior peremptory challenges of prospective jurors. In making extensive findings on the record, the trial court concluded that, even though the reasons articulated by defense counsel are

> sound, in and of themselves, when you start looking at the . . . African-American jurors that weren't challenged and start realizing that there is an abundance of African-American jurors who have perhaps responded in similar or identical manner that weren't challenged, then the soundness of those reasons starts to evaporate.

Moreover, the court acknowledged that

> in listening to [Ms. Ward's] responses . . . [she] seemed very candid, forthright, ready to respond to anything asked of her, willing to listen to the case; a bright, articulate, intelligent woman who said she could be fair and impartial. . . . [W]hen she was challenged, it did raise a red flag in my mind because I can't think of anything valid --- anything that I would consider to be a valid race-neutral reason in the context of all the jurors that are on the panel right now. . . . [A]ll these women are the women who apparently nodded at the wrong time or apparently were too quick to agree that they could follow the law.

Specifically, the court concluded that, as to the burglary, Ms. Ward indicated that the incident would have no bearing whatsoever on her ability to sit on this case. "There are other jurors who have had equal or greater crimes committed against them who are still on the panel." With regard to the death penalty, Ms. Ward is no different than many of the other African-American jurors who have not been challenged. Ms. Ward indicated that the fact that her ex-husband of nine years ago was addicted to cocaine or alcohol would have absolutely no bearing on her ability to sit on this case and the court noted that "other jurors have had at least as close or have had similar types of relatives or friends involved with drugs or alcohol who were not challenged."

> And the temporary insanity situation. . . . I'm not sure that nod, in and of itself, is a sufficient race-neutral reason particularly in light of the fact that there were no follow-up questions, no attempt to clarify what that nod meant, what she was agreeing with, whether she was nodding in agreement with Mr. Tisdale or nodding in agreement with the juror or

nodding because she was getting sleepy . . . [t]here is no attempt to clarify what that nodding was all about.

The court concluded that the basis for the challenge exercised by the defense is not sufficient "when viewed in the context of all the jurors that are presently on the panel and those who have thus far been dismissed." The court then reseated Ms. Ward.

The appellant now disputes the trial court's ruling that defense counsel failed to assert sufficient race-neutral explanations for the exercise of the peremptory challenge against Juror Ward. Alternatively, he argues that, in any event, the reseating of Juror Ward resulted in the possibility of bias against the appellant by that juror.

The United States Supreme Court has consistently recognized that racially-based juror exclusions affect and injure the integrity of the justice system. See Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 902 (Tenn. 1996) (citing Strauder v. West Virginia, 100 U.S. 303, -- S.Ct. – (1879); Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579 (1935); Hollins v. Oklahoma, 295 U.S. 394, 55 S.Ct. 784 (1935) (*per curium*); Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261 (1946); Carter v. Jury Comm'n of Greene County, 396 U.S. 320, 90 S.Ct. 518 (1970)). Discrimination in the jury selection process not only constitutes a federal offense, but also taints the judicial process and "extends beyond that inflicted on the [litigant] and the excluded juror to touch the entire community." Woodson, 916 S.W.2d at 902 (citing 18 U.S.C. § 243 (1969); Batson v. Kentucky, 476 U.S. at 79, 106 S.Ct. at 1712). See also Powers v. Ohio, 499 U.S. 400, 409, 111 S.Ct. 1364, 1370 (1991) (emphasizing that the individual juror has a right not to be excluded from a petit jury on account of race). "The exclusion 'undermine[s] public confidence in the fairness of our system of justice.'" Woodson, 916 S.W.2d at 902 (citing Batson, 476 U.S. at 87, 106 S.Ct. at 1718).

10

The Supreme Court's decision in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348 (1992), ensures that Batson will apply to all parties by prohibiting criminal defendants from using peremptory challenges to strike a venireperson solely on the basis of the venireperson's minority status.[9] Thus, the State may make a "reverse" Batson objection.

Under McCollum, a defendant is subject to the three-part test outlined in Batson. To invoke the protections of Batson and its progeny, the State must establish a prima facie case that a juror is being challenged on the basis of race or gender. See Batson, 476 U.S. at 94, 106 S.Ct. at 1721; see also Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770-71 (1995); Woodson, 916 S.W.2d at 902. Once the State has presented a prima facie case, the trial court shall require the defendant to give a race-neutral reason for the challenge. McCollum, 505 U.S. at 59, 112 S.Ct. at 2359; see also Purkett, 514 U.S. at 767, 115 S.Ct. at 1770-71. "The race or gender neutral explanation need not be persuasive, or even plausible . . . . Unless a discriminatory intent is inherent in the [proponent's] explanation, the reason offered will be deemed race neutral." Purkett, 514 U.S. at 767, 115 S.Ct. at 1770-71. If a race or gender neutral explanation is given, the court must then determine, given all the circumstances, whether the State has established purposeful discrimination. McCollum, 505 U.S. at 59, 112 S.Ct. at 2359; Batson, 476 U.S. at 96-98, 106 S.Ct. at 1723-24; see also Purkett, 514 U.S. at 767, 115 S.Ct. at 1770-71. Although a trial court must accept a facially race-neutral explanation for purposes of determining whether the proponent has satisfied his burden of production, this does not mean that the court is bound to believe the explanation in making its determination. In other words, while the court may find that a proffered explanation is race-neutral, the court is not required, in the final analysis, to find that the proffered explanation was the actual reason for striking the

_____

[9]McCollum held that a criminal defendant, although otherwise in an adversarial relationship, is an agent of the State for the particular purpose of exercising a peremptory challenge when picking a jury. McCollum, 505 U.S. at 55-56, 112 S.Ct. at 2357.

juror.  If the court determines that a race or gender based motive was behind the challenge, the juror may not be excluded.  Woodson, 916 S.W.2d at 903.

In making its determination, the trial court must look to the totality of the circumstances for rarely will a party admit that its purpose in striking a juror was discriminatory.  Accordingly, the trial court may infer discriminatory intent from circumstantial evidence.  "The factfinder's disbelief of the reasons put forth by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination, and . . . no additional proof of discrimination is required."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749 (1993).  Additionally, the court may consider whether similarly situated members of another race were seated on the jury or whether the race-neutral explanation proffered by the strikes' proponent is so implausible or fantastic that it renders the explanation pretextual.  The trial court may also consider the demeanor of the attorney who exercises the challenge which is often the best evidence of the credibility of his proffered explanations.  See Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 1868-1869 (1991).

Because a trial record alone cannot provide a legitimate basis from which to substitute an appellate court opinion for a trial court's findings, the trial court must carefully articulate its findings on the record.  The trial court has the opportunity to both visually and auditorially observe the demeanor of both prospective jurors and counsel and, accordingly, evaluate their credibility.  See State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994), cert. denied, -- U.S. --, 116 S.Ct. 996 (1995) (citing State v. Ellison, 841 S.W.2d 824, 827 (Tenn. 1992)).  On appeal, the trial court's findings are to be accorded great deference and are not to be set aside by this court unless clearly erroneous.  See Woodson, 916 S.W.2d at 906 (citing In re A.D.E., 880 S.W.2d 241, 2432 (Tex. App. 1994)); Smith, 893 S.W.2d at 914.

12

In the present case, the evidence supports the trial court's finding that the proffered reasons for the appellant's strikes were pretextual and that the strike was actually exercised for a racially discriminatory purpose. At this point, the appellant had used six of his seven peremptory strikes to eliminate white female jurors, and an additional strike to eliminate a white male juror. This patent use of peremptory strikes to exclude jurors of one race establishes a prima facie showing of discrimination. Additionally, the trial court was in a far better position than this court to evaluate the appellant's laundry list of race-neutral explanations. The trial court made extensive findings on the record to support his conclusions. Moreover, the trial court was able to observe the demeanor of defense counsel and the challenged jurors. Accordingly, we hold that the record supports the trial court's conclusion that the peremptory challenge lodged by the appellant against Juror Ward was racially/gender motivated.

We next address the appellant's contention that the trial court erred in reseating Juror Ward after finding that defense counsel had violated Batson. Specifically, he argues that, "having Juror Ward reinstated to the panel [after a jury out hearing,] impermissibly suggests to the prospective jurors that the appellant is the one who has exercised his peremptory challenge against her, thereby raising the possibility of bias against the appellant by that juror." We disagree.

Although leaving the task of prescribing the appropriate remedy for the unconstitutional exercise of a peremptory strike to the states, the Supreme Court identified two possible remedies: reseating persons improperly struck and discharging the entire venire. Batson, 476 U.S. at 100 n. 24, 106 S.Ct. at 1725 n. 24. In Woodson v. Porter Brown Limestone Co., 916 S.W.2d at 906-907, our supreme court determined that the selection of an appropriate remedy is best left to the discretion of the trial court. For guidance the court proposed two alternative remedies, *i.e.*, the court may exclude the entire venire and begin selection with a

13

new panel, or, "the juror should remain, his or her name should not be announced, and the excluding party should be restored to the peremptory challenge." Accord. Jefferson v. State, 595 So. 2d 38, 41 (Fla. 1992); Jones v. State, 683 A.2d 520, 529 (1996); Commonwealth v. Fruchtman, 633 N.E. 2d 369, 373 (Mass.), cert. denied, 513 U.S. 951, 115 S.Ct. 366 (1994); Ezell v. State, 909 P.2d 68, 72 (Okla. Crim. App. 1995); State ex rel. Curry v. Bowman, 885 S.W.2d 421, 425 (Tex. Crim. App.), cert. denied, 513 U.S. 866, 115 S.Ct. 184 (1994); Coleman v. Hogan, 486 S.E.2d 548, 550 (Va. 1997). In the present case, the trial court chose the latter method of recourse. We find this method of reparation quite appropriate. If the trial court, after finding purposeful discrimination by the appellant, were to remove the challenged juror from the panel, the appellant would be profiting from his own misconduct because, as a result, he would get the jury that he wanted. Moreover, removing the juror does not correct the Batson violation because the excluded juror has still been subjected to discrimination. Accordingly, we find no error by the court's reseating of Juror Ward. This issue is without merit.

## II. Insanity Defense

Originally captioned under "sufficiency of the evidence," the appellant next argues that the State has failed to prove that he was not insane at the time of the commission of the offenses beyond a reasonable doubt. When there is a challenge to the sufficiency of the evidence, the standard for review by an appellate court is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); Tenn. R. App. P. 13(e). Clearly, the evidence is overwhelming to find the appellant guilty, beyond a reasonable doubt, of felony murder and especially aggravated robbery.

14

Thus, the only question is whether the appellant was legally sane at the time the offense was committed. The jury concluded that the appellant was sane and we agree.

In a criminal prosecution, the sanity of the accused is presumed. State v. Overbay, 874 S.W.2d 645, 650 (Tenn. Crim. App. 1993); Brooks v. State, 489 S.W.2d 70, 72 (Tenn. Crim. App. 1972). Thus, the accused bears the initial burden of proof. However, if the evidence raises a reasonable doubt as to the sanity of the defendant, the State assumes the burden of proving the defendant's sanity beyond a reasonable doubt. State v. Sparks, 891 S.W.2d 607, 615 (Tenn. 1995). Once the burden has shifted to the State, sanity becomes an essential element of the crime. Sparks, 891 S.W.2d at 616 (citations omitted). The State does not contend on appeal that the appellant made an inadequate prima facie showing of insanity. Therefore, we proceed directly to the sufficiency of the State's rebuttal evidence.

"Insanity is a defense to prosecution if, at the time of such conduct, as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law." Tenn. Code Ann. § 39-11-501(a)(1991) (amended 1995); Graham v. State, 547 S.W.2d 531, 543-44 (Tenn. 1977). Thus, in order to prove sanity, the State must prove either: "(a) the defendant was not suffering from a mental illness at the time of the offense; (b) the illness did not prevent the defendant from knowing the wrongfulness of his act and did not render the defendant substantially incapable of conforming his conduct to the requirements of the law." State v. Peevyhouse, No. 01C01-9409-CC-00307 (Tenn. Crim. App. at Nashville, Mar. 22, 1996), perm. to appeal dismissed, (Tenn. Sept. 9, 1996) (citing State v. Jackson, 890 S.W.2d 436, 440 (Tenn. 1994); Graham, 547 S.W.2d at 544).) The State may show the sanity of the accused "through the use of expert testimony, lay testimony, or by showing that the defendant's behavior prior to,

15

during, or after the commission of the crime was consistent with sanity and inconsistent with insanity." Peevyhouse, No. 01C01-9409-CC-00307 (citing Edwards v. State, 540 S.W.2d 641, 646 (Tenn. 1976), cert. denied, 492 U.S. 1061, 97 S.Ct. 784 (1977)). The appellant (citing Jackson, 890 S.W.2d at 441) asserts that, although the State's proof is consistent with sanity, it is not inconsistent with insanity, and, therefore, the proof is insufficient to establish the appellant's sanity beyond a reasonable doubt.

Dr. Little, the neuropsychologist testifying on behalf of the appellant, opined that the appellant suffered from organic mental disorder, a mental illness or mental disorder caused by damage to the brain by structural insult. She concluded that this brain impairment resulted in impulsivity which impaired the appellant's ability to conform his behavior to the law at that time. In rebuttal, the State presented two clinical psychologists. Both concluded that the appellant was not suffering from a mental illness and that an insanity defense could not be supported. Both found that the appellant could appreciate the wrongfulness of his behavior and that he could conform his behavior to the requirements of the law. Like Dr. Whirley, Dr. Nichols concluded that, although the appellant exhibited impulsive behavior, the conduct in question was not impulsive but rather clearly goal oriented.

In addition to this expert testimony presented by the State, lay testimony supports the conclusion that the appellant could appreciate the wrongfulness of his conduct. Edroy Ballard testified that the appellant and his co-defendant discussed the robbery prior to committing the crime. The surviving victim, Maxine Swartz, testified that, before shooting her, the appellant stated, "Ms. Maxine, I sure hate to do this to you." Moreover, the appellant's mother and stepfather both testified that the appellant admitted that he had done something awful.

16

The issue of insanity at the time of a crime is a question for the jury to decide. Spurlock v. State, 368 S.W.2d 299 (1963). In making its determination, the jury is allowed to consider both lay and expert testimony as evidence, and it may discount expert testimony which it finds to be in conflict with the facts of the case. Sparks, 891 S.W.2d at 616. By its verdict, the jury obviously accredited the State's proof over the contrary testimony of Dr. Little. We cannot dispute the jury's conclusion. The evidence supports a finding by a rational trier of fact of the appellant's sanity beyond a reasonable doubt. This issue is without merit.

### III. Testimony of Dr. Little

In his final issues, the appellant asserts that the trial court erred by prohibiting Dr. Little to enumerate the diagnoses or opinions of non-testifying physicians and by prohibiting Dr. Little from testifying regarding the alleged effects and reactions of cocaine on a person with a history of seizure disorder. We address these contentions accordingly.

### A. Diagnoses of Non-Testifying Physicians

First, the appellant contends that the trial court erred by prohibiting Dr. Little from relating to the jury the diagnoses and opinions of other non-testifying physicians. This issue is best summarized by the trial court's findings:

> The question is whether she should in addition to relating her opinion
> be allowed to go further and tell the jury about the opinions that were
> reached by these other doctors on these other occasions. . .
> . . .[S]he may testify and give her opinion. But it doesn't say anything
> about her then being allowed to go further and tell the jury about all
> these other opinions and diagnoses from these other doctors from who
> knows where under who knows what types of criteria and
> circumstances with who knows what type of motivation and standard
> that was being applied at any other given time.
> . . .
> She can state in general terms that her opinion is based at least in part
> on these records and hospitalizations of your client over the past eight
> or ten years . . . . But she cannot state in specific terms that your client
> has been diagnoses by Dr. John Doe in 1987 as having such and such

a problem, and therefore that led her to conclude that today he's - - or on the date of this offense he was suffering from this other problem.

Rule 703 of the Tennessee Rules of Evidence permits an expert witness to base an opinion on facts not in evidence , even if the underlying facts themselves are not admissible. See Advisory Commission Comment, Tenn. R. Evid. 703. "When an expert bases his opinion on facts that are not independently admissible into evidence, the trial judge should either prohibit the jury from hearing the foundation for the testimony or deliver a cautionary instruction." Benson v. Tennessee Valley Elec. Co-op., 868 S.W.2d 630, 641 (Tenn. App. 1993) (citing Tenn. R. Evid. 703, Advisory Commission Comments). In the present case, the reports of the non-testifying physicians constitute hearsay and, as they do not fall within one of the enumerated exceptions, are not admissible. See Tenn. R. Evid. 801(c). The decision to admit or exclude expert testimony is within the sound discretion of the trial court. State v. Hawk, 688 S.W.2d 467, 472 (Tenn. Crim. App.1985). Unless there is a clear showing of an abuse of discretion, an appellate court will not disturb that decision. The trial court did not limit Dr. Little's ability to give her own personal opinion regarding her conclusions based upon the reports of the non-testifying physicians. We cannot conclude that the trial court abused its discretion by preventing Dr. Little from testifying to inadmissible hearsay. This issue is without merit.

**B. Effects of Cocaine to Seizure Disorders**

During the appellant's trial, defense counsel attempted on numerous occasions to have Dr. Little, a neuropsychologist, testify regarding the effects that cocaine would have on an individual with a history of seizure disorders.[10] The trial

---

[10]We are constrained to note that the appellant frames his issue as "Whether the court erred in denying testimony of Defendant's expert witness as to the effects of cocaine on the mental functioning and capacity of a person afflicted with seizure disorder . . . ." (emphasis added). The trial court expressly permitted inquiry into this subject area. Thus, this issue, as currently framed, is broader in scope than the issue raised at the appellant's trial.

court prohibited such testimony concluding that Dr. Little was neither a medical doctor nor an expert in the field of pharmacology or toxicology.

At trial, both parties extensively voir dired Dr. Little as to her qualifications, knowledge and experience relative to both the behavioral and physical effects of the combination of Dilantin and cocaine on an individual. The appellant argued that Dr. Little was qualified to give her opinion as to the physical effects of these drugs because she had read literature and observed patients on cocaine. The trial court, making extensive findings on the record, concluded that Dr. Little's "general classroom discussions and her occasional clinical involvement [with A & D patients] does not equate with expertise in this field." The court expressly prohibited Dr. Little from "offering an opinion with regard to the effects that cocaine has on the body or the increased likelihood of seizures and things of that sort." Nonetheless, based upon her experience as a psychologist, the court permitted Dr. Little to testify regarding the "behavioral consequences of individuals that she's treated who have come in and reported a history of drug - - of cocaine addiction or on Dilantin or suffering from seizures."

The determination of the qualifications of an expert witness and the relevancy and competency of expert testimony are matters generally entrusted to the sound discretion of the trial court. State v. Anderson, 880 S.W.2d 720, 728 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1994). This court will not overturn the trial court's decision absent a clear abuse of discretion. Id. (citing State v. Williams, 657 S.W.2d 405, 411 (Tenn. 1983), cert. denied, 465 U.S. 1073, 104 S.Ct. 1429 (1984)). The record does not establish that the trial court abused its discretion. We find no merit to this issue.

19

**IV. Conclusion**

For the foregoing reasons, we affirm the judgment of convictions and the sentences imposed for the offenses of felony murder and especially aggravated robbery.

_____
DAVID G. HAYES, Judge

CONCUR:

_____
JOHN H. PEAY, Judge

_____
PAUL G. SUMMERS, Judge