IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 30, 2003 Session

**STATE OF TENNESSEE v. RICKY THOMPSON**

**Direct Appeal from the Criminal Court for McMinn County**
**Nos. 89-705, 89-706, 89-707     John K. Byers, Judge**

**No. E2002-02631-CCA-R3-CD**
**August 27, 2003**

The Defendant, Ricky Thompson, was convicted by a jury of first degree murder, aggravated assault, and arson. He was sentenced to death for the first degree murder. Upon the Defendant's motion for judgment of acquittal, the trial court entered an order modifying the jury's verdicts to not guilty by reason of insanity. The State raises one principal issue in this direct appeal, which it states as follows: whether the trial court erred in reversing the jury's determination of guilt and granting the Defendant a judgment of acquittal by reason of insanity on charges of first degree murder, aggravated assault, and arson. Because we find the evidence legally sufficient to support the jury's verdicts, we reverse the trial court's order, reinstate the jury's verdicts, and remand the case to the trial court for consideration of the Defendant's motion for a new trial and sentencing on the aggravated assault and arson convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Remanded**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Charles Corn, Cleveland, Tennessee; Lee E. Ledbetter, Athens, Tennessee; and Brock Mehler, Nashville, Tennessee, for the appellee, Ricky Thompson.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; Jerry N. Estes, District Attorney General; and William W. Reedy and Amy Reedy, Assistant District Attorneys General, for the appellant, State of Tennessee.

**OPINION**

In 1991, the Defendant was tried and convicted of first degree murder, aggravated assault, and arson. He was sentenced to death for the murder, six years for aggravated assault, and four years for arson. On direct appeal, this Court reversed the Defendant's convictions and ordered a new trial

based upon the trial court's error in excluding expert testimony regarding the Defendant's mental state at the time of the offenses. See State v. Ricky Thompson, No. 03C01-9406-CR-00198, 1996 WL 30252 (Tenn. Crim. App., Knoxville, Jan. 24, 1996).

The Defendant was retried in June of 2000, and was again convicted of first degree murder, aggravated assault, and arson. He was again sentenced to death for the murder. On June 29, 2000, the Defendant filed a motion for a new trial and/or judgment of acquittal. In response to this motion, the trial judge entered an order modifying the jury's verdicts to not guilty by reason of insanity. It is from this order that the State appeals as of right.

On the evening of October 25, 1989, the Defendant's wife, Nina Thompson, did not return to the mobile home, where she resided with the Defendant, after she left work. The Defendant spent the night looking for her. He went to the convenience store where she worked and spoke with her coworker, Kevin Helms. The Defendant repeatedly asked Mr. Helms if he knew where Nina was. Mr. Helms testified that the Defendant appeared to have reached a "boiling point." The Defendant stated that "he was ready to kill someone" and that "he was going to kill the cops if they came to his trailer." The Defendant purchased two gallons of gasoline from Mr. Helms, which he stored in two milk jugs. He also took Mr. Helms to his car, where he showed him an assault rifle.

The Defendant also went to the home of Nina's mother, Elizabeth Vann, in the early morning hours of October 26. According to Ms. Vann's prior testimony, which was read into the record, the Defendant asked if Nina was there. When Ms. Vann replied that she was not, the Defendant went to his car and got his eight-month-old son, Ricky. The Defendant held little Ricky up in front of Ms. Vann and said, "I'm just going to blow his damn brains out" and "I'm going to kill that damn bitch Nina."

Later that morning, Nina, her seventeen-year-old niece, Christy Rominger, and Nina's five-year-old daughter, Vanessa, drove to the Defendant's mobile home. Nina and the Defendant began arguing, and the Defendant threatened to hurt her and the children if she did not do what he said. According to Christy, Nina "motioned with her eyes" for Christy and Vanessa to run. The three of them ran out the door to Christy's car, with Nina carrying little Ricky in her arms.

When Nina ran from the trailer with little Ricky, the Defendant picked up an assault rifle, which had been laying in the living room, and followed. He tapped on the passenger-side window of Christy's car and ordered Nina to get out. Nina got out with the baby in her arms. According to Christy, Christy began blowing the car horn and screaming for help. The Defendant told her to "shut the fuck up," and then he shot her in the right leg. Christy managed to open the car door, grab Vanessa, and run across the street.

Testimony from three of the Defendant's neighbors who witnessed the shooting related that Nina was holding little Ricky while she argued with the Defendant. When Nina turned to run, the Defendant shot her in the back. She fell down, and the Defendant shot her several more times as she lay on the ground. The Defendant also fired several shots into the air and into cars that were parked

-2-

nearby. The Defendant then picked up little Ricky and walked back toward his trailer. Within a few minutes, neighbors witnessed black smoke coming from the trailer. The Defendant carried the baby across the street to an auto parts store where the Defendant bought a soft drink, took some unidentified "powder," and waited for the police to arrive.

The jury found the Defendant guilty of first degree murder, aggravated assault and arson. In its order modifying the jury's verdict to not guilty by reason of insanity, the trial judge stated that the State failed to prove the Defendant's sanity beyond a reasonable doubt.[1] Specifically, the trial court opined:

> The state's evidence on sanity consisted entirely of cross-examination of the defendant's expert witnesses and of some lay testimony concerning the defendant's behavior leading up to the event. The state presented no expert witnesses. Although several witnesses testified for the state that the defendant was acting "normal," many of these same witnesses also testified that the defendant was "odd," "nutty," "strange," or "different." Family members of the victim testified that when the defendant was looking for the victim at 4:00 a.m. the morning before the murder, that he had threatened anyone who tried to take his child and had said he would kill them all and be out of the Moccasin Bend [Mental Health Institute] in time to piss on their graves. There was a discrepancy about when this statement was actually made and the person who testified that he heard these comments never told anyone about them until the time for retrial, about 10 years after the offense. They also testified that the defendant threatened to harm the children. Even these family members indicated that the defendant was not acting in a rational manner.

> After carefully considering all the evidence, this court finds that while the record may contain some evidence on the issue of the defendant's possible sane mental state at the time of the offense, the defendant's sanity was not proven beyond a reasonable doubt as required by the law. Accordingly, this court finds that the jury's verdict should be modified to NOT GUILTY BY REASON OF INSANITY.

Rule 29(c) of the Tennessee Rules of Criminal Procedure provides that, where a jury returns a verdict of guilty, a defendant may file a motion for judgment of acquittal within thirty days of the date on which the order of sentence is entered. Upon such motion, the trial court may set aside the jury's verdict and, after disposing of a motion for a new trial, enter a judgment of acquittal. The standard by which the trial court determines a post-verdict motion for judgment of acquittal is the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction; that is, whether the evidence is legally sufficient to support the conviction. See State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). Therefore, if "any rational trier of fact

---

[1]Prior to 1995, if the defendant presented evidence that raised a reasonable doubt as to his sanity, the burden shifted to the State to prove the defendant's sanity beyond a reasonable doubt. See State v. Flake, 88 S.W.3d 540, 550 (Tenn. 2002); Graham v. State, 547 S.W.2d 531, 544 (Tenn. 1977).

could have found the essential elements of the crime beyond a reasonable doubt," Jackson v. Virginia, 443 U.S. 307, 319 (1979), the motion for judgment of acquittal should be denied. See State v. Gillon, 15 S.W.3d 492, 496 (Tenn. Crim. App. 1997); State v. Adams, 916 S.W.2d at 473. The court does not re-weigh or reevaluate the evidence. See State v. Dankworth, 919 S.W.2d 52, 56 (Tenn. Crim. App. 1995); State v. Adams, 916 S.W.2d at 473.

Although the trial judge did not specifically reference Rule 29, the decision reached by the judge to alter the verdict to not guilty by reason of insanity indicates his intent to set aside the jury's verdict and enter a judgment of acquittal as provided in Rule 29.

The State points out that, in its order, the trial court co-mingled with its sufficiency review language that is appropriate only under a Tennessee Rule of Criminal Procedure 33(f) "thirteenth juror" analysis. Rule 33(f) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." The State cites the trial judge's comments regarding the prosecution's failure to present expert witnesses and discrepancies in the testimonies of the victim's family members. Furthermore, the trial judge included the following paragraph at the end of his order:

> Additionally, this court finds that the jury may have been confused on the issue of sanity by this court's instructions to the jury about how they were to consider the testimony of Dr. Bernet. After carefully considering this in conjunction with the evidence presented, this court pursuant to Rule 33(f) would also modify the verdict as indicated above.[2]

The co-mingling of a citation to Rule 33(f) and language that is appropriate under that rule with language that is traditionally associated with a sufficiency analysis renders the trial court's order less than clear. However, the result of the order is unmistakable: the jury's verdict was overturned, and the Defendant was declared not guilty. Such a result may only be achieved pursuant to Tennessee Rule of Criminal Procedure 29(c).

The State argues that the trial court erred by finding that, as a matter of law, there was insufficient evidence of the Defendant's sanity. We apply the identical standard as a trial court in reviewing a grant or denial of a motion for judgment of acquittal, that is, whether the evidence is legally sufficient to sustain the conviction. See State v. Adams, 916 S.W.2d at 473. Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000).

---

[2] We note that under Rule 33(f) of the Tennessee Rules of Criminal Procedure, a trial court may not modify a jury's verdict. Rather, Rule 33(f) provides that a trial court may grant a new trial after it independently weighs the evidence and assesses the witnesses' credibility. See State v. Dankworth, 919 S.W.2d 52, 56 (Tenn. Crim. App. 1995). "The trial judge must be personally satisfied with the verdict" under Rule 33(f). Id.

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

Prior to 1995, insanity was a defense to prosecution "if, at the time of such conduct, as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law." Tenn. Code Ann. § 39-11-501(a) (1991) (amended 1995). The sanity of the accused is presumed. See State v. Overbay, 874 S.W.2d 645, 650 (Tenn. Crim. App. 1993); Brooks v. State, 489 S.W.2d 70, 72 (Tenn. Crim. App. 1972). However, if the evidence presented by either party raises a reasonable doubt as to the defendant's sanity, the presumption falls, and the State must establish beyond a reasonable doubt that the defendant appreciated the wrongfulness of his conduct and had the capacity to conform that conduct to the requirements of the law. See State v. Clayton, 656 S.W.2d 344, 345 (Tenn. 1983); Graham v. State, 547 S.W.2d 531, 544 (Tenn. 1977).

> This burden can be met by the state through the introduction of expert testimony on the issue, or through lay testimony where a proper foundation for the expressing of an opinion is laid, or through the showing of acts or statements of the petitioner, at or very near the time of the commission of the crime, which are consistent with sanity and inconsistent with insanity.

Edwards v. State, 540 S.W.2d 641, 646 (Tenn. 1976). Thus, "the jury is allowed to consider both lay and expert testimony as evidence, and it may discount expert testimony which it finds to be in conflict with the facts of the case." State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995); see also State v. Patton, 593 S.W.2d 913, 916 (Tenn. 1979) (holding that "a jury is not required to accept testimony of a psychiatrist on the issue of sanity to the exclusion of lay testimony or to the exclusion of evidence of the actions of the petitioner inconsistent with insanity").

It does appear that the Defendant successfully raised a reasonable doubt at trial as to his sanity. The Defendant presented two expert witnesses, Dr. Michael Tramontana, a clinical psychologist, and Dr. William Bernet, a forensic psychiatrist. After performing a series of tests on the Defendant, Dr. Tramontana concluded that there was evidence that the Defendant suffered from a "mild to moderate" impairment in the frontal lobe of his brain. According to the doctor, an impairment in the frontal lobe of the brain could affect "impulse control, delay, the ability to think ahead and plan and suppress what would be an immediate reaction . . . ." Dr. Tramontana also testified that the Defendant's impairment would affect his ability to focus, concentrate, plan, and

organize. The condition could be exacerbated by a stressful situation or intoxication. Dr. Tramontana opined that the Defendant's mental impairment could have "interfered with his having a state of mind that would have allowed him to exercise proper delay in judgment in a provocative situation such as the alleged crime." Perhaps the strongest testimony for the defense from Dr. Tramontana on the issue of insanity was as follows:

> I believe that based on the impairments that he had demonstrated to us and the evaluation we performed in January of 2000 that those impairments were of a significance and of a magnitude that they would have contributed to, they would have been contributing factors in impairing his judgment, his reasoning, and his ability to delay and inhibit impulsive reactions on the day of the alleged crime.

Dr. Bernet, after performing a psychiatric evaluation of the Defendant, agreed that the Defendant suffered from impairment to the frontal lobe of his brain, which governs an individual's self-control and ability to exercise judgment and curb impulsive behavior. The doctor believed that the Defendant's condition was the result of his chronic alcohol abuse. He stated that the Defendant's frontal lobe impairment could affect his ability to premeditate, to "think things through," to "plan ahead," and "weigh the pros and cons before you actually do an act." Furthermore, Dr. Bernet concluded that the Defendant also had a chronic psychiatric disorder called schizo-affective schizophrenia. Dr. Bernet testified that the main characteristic of schizophrenia is a loss of touch with reality. Typically, a person suffering from schizophrenia will have delusions, meaning false beliefs, and hallucinations. Schizo-affective schizophrenia is characterized by drastic moods, either high or low. Also, people suffering from this disease have "good periods," during which they function well, and other periods, in which they are very disturbed. In other words, it is an illness that "comes and goes." Dr. Bernet stated that the Defendant's mental conditions - the frontal lobe impairment and the schizo-affective schizophrenia - could aggravate one another. The doctor proceeded to recount the Defendant's significant history of mental health problems, which included numerous hospitalizations from 1968 to 1984. When he was asked whether the Defendant's mental defects would "diminish or prevent his ability to determine right and wrong," Dr. Bernet answered, "It would certainly diminish[,] it would certainly affect. It would certainly diminish his ability." When he was asked whether the Defendant's mental defect and disease would affect his ability to conform his actions to the law, Dr. Bernet responded, "Yes. It would definitely affect his ability." Perhaps the strongest testimony for the defense from Dr. Bernet on the issue of insanity is contained in the following dialogue between defense counsel and Dr. Bernet.

Defense counsel: Based on your entire investigation, history, examination, testing, and all of these facts we've talked about . . . , do you believe on the date of this occasion that the mental illness[,] defect or condition he was suffering under was one that did affect his ability to appreciate or discern right from wrong?

| | |
|---|---|
| Dr. Bernet: | Yes, I think it would have affected his ability to appreciate right from wrong. |
| Defense counsel: | And likewise, do you believe that those same conditions that he suffered would have prevented him from conforming his actions to any appreciation of right from wrong even if he could have appreciated right from wrong? |
| Dr. Bernet: | They're the kind of conditions that could have prevented him from conforming his acts. |

The defense also presented the testimony of Nancy Smith, the Defendant's first cousin, who grew up with the Defendant. She testified that the Defendant was always strange, even as a small child. She testified that he spent considerable time throughout his life being treated for mental disorders. She also stated that she was aware of several occasions on which the Defendant attempted to commit suicide. Ms. Smith believed that, at times, the Defendant was out of touch with reality. She explained that he would talk about strange things, like "the ghostriders in the sky." According to Ms. Smith, at the time of the killing and throughout most of his life, the Defendant had been mentally ill.

We conclude that the testimony of the two doctors and Ms. Smith regarding the Defendant's mental health problems shifted the burden of proving the Defendant's sanity to the State. See State v. Clayton, 656 S.W.2d at 345. As is altogether permissible, the State relied upon lay testimony and cross-examination of the Defendant's experts in an attempt to establish the Defendant's sanity beyond a reasonable doubt.

Dr. Stephen Ross Rogers, the Defendant's physician who had been treating the Defendant for six months prior to the homicide, prescribed Valium for the Defendant's anxiety. On October 25, 1989, the day before the shooting, the Defendant came to Dr. Rogers's office for a refill of his prescription. According to his notes, Dr. Rogers found the Defendant to be "stable" when he saw him on the day before the shooting.

Vickie Lynn Estelle, who worked with the victim at the convenience store, testified that she knew the Defendant because he would hang around the store while the victim was working. She stated that she never observed any unusual behavior from the Defendant. Ms. Estelle also testified that the victim told her several times that the Defendant and she were having domestic problems. On October 25, 1989, the day before the killing, the Defendant had been hanging around the convenience store for some time. Ms. Estelle told the victim that he would have to leave. Ms. Estelle testified that, as he was leaving the store at approximately 4:30 in the afternoon, the Defendant said to the victim and her, "You bitches will be sorry. You will pay." On cross-examination, Ms. Estelle stated that she believed the Defendant was a good father, and that he was somewhat withdrawn and a little bit different.

Kevin Helms, another of the victim's coworkers at the convenience store, testified that he knew the Defendant and saw him most every day for approximately one year. He stated that he never saw anything bizarre or unusual about the Defendant. As the victim was leaving the store on October 25, she told Mr. Helms, "to tell [the Defendant] that I didn't know where she was if [the Defendant] was to ask." Some time thereafter, the Defendant called the store, looking for the victim. Mr. Helms replied that he did not know her whereabouts. Mr. Helms testified that, around 2:00 or 3:00 the next morning, the Defendant arrived at the store with his infant son. Mr. Helms described the Defendant as "agitated," but he did not appear to be under the influence of drugs or alcohol. The Defendant left the store, but he came back approximately an hour or an hour-and-a-half later. He continued to ask whether Mr. Helms knew where the victim was. At that point, the Defendant bought two gallons of either gasoline or kerosine, which he stored in two gallon jugs. Mr. Helms testified that the Defendant appeared to have reached a "boiling point," and the Defendant "kept saying he was ready to kill someone." The Defendant asked Mr. Helms to come out to his car, where he showed him an assault rifle. The Defendant told him it was a 7.62 millimeter weapon. Mr. Helms testified that "[The Defendant] asked me again where Nina was, and that - he said - again, he reiterated that he was mad enough to kill someone, and he was going to kill the cops if they come to his trailer."

On cross-examination, Mr. Helms conceded that, in his prior testimony, he stated that, on October 25 and 26, the Defendant appeared to be "drugged up," which was not an uncommon demeanor for the Defendant. He also agreed that the Defendant was quiet and unemotional. Mr. Helms testified that, to the best of his recollection, the Defendant bought one pack of wine coolers from the convenience store on the night in question, and the Defendant told him that he had been taking pills that evening.

Joe Vann, the victim's brother, testified that the evening before the shooting, he was at home with his mother, Elizabeth Vann. The Defendant came by their house, "revving up his car, blowing his horn . . . hollering and stuff." The Defendant got out of his vehicle and said, "Where in the hell is Nina?" When Mr. Vann told him that she was not there, the Defendant said, "You're lying." Then he said, "You better tell me right now or I'll kill you and your momma and all of your family" while he was waving his gun. Mr. Vann testified that the Defendant went on to say that

> he was going to kill me and my momma and my whole family if we didn't tell him where [Nina] was, and he's going to come back and piss on our graves, and all they'd do to him was send him to Moccasin Bend [Mental Health Institute] and he'd be up there about a couple of months and be back in time to come back and piss on our graves, the grass won't even be on our graves yet.

Mr. Vann stated on cross-examination that the Defendant was very jealous of his wife, Nina. However, he refused to characterize him as "crazy" or "different."

Mr. Vann further testified that he witnessed a conversation between his brother, David Vann, and the Defendant, in which the Defendant was telling David Vann how to feign mental illness. In

-8-

Mr. Vann's words, the Defendant "was telling David how to go to his doctor, speak to his doctor, and say that he's hearing voices and just look away from his doctor and just stare at the walls and just start talking and then go back to the subject matter that he was talking about . . . ."

The prior testimony of Elizabeth Vann, the victim's mother, who was unavailable at the time of the second trial, was read into the record. The Defendant went to the home of Ms. Vann early on the morning of October 26. The Defendant asked whether Nina was there. When Ms. Vann replied that she was not, the Defendant went to his car and got his eight-month-old son Ricky. The Defendant held the baby up in front of Ms. Vann and said, "I'm just going to blow his damn brains out, and also Vanessa" and "I'm going to kill that damn bitch Nina." When Ms. Vann asked the Defendant to give her the baby, the Defendant replied, "There ain't no damn bitch or no son-of-a[-]bitch going to get that baby."

Jack Curtis, the owner of the auto parts store across the street from the trailer park where the Defendant lived, testified that he had known the Defendant for three or four years prior to the date the victim was killed. He stated that the Defendant would come by his business two or three times a week to talk for thirty or forty minutes. Mr. Curtis testified that he had never witnessed behavior which could be characterized as unusual or bizarre from the Defendant. After the Defendant shot the victim and set fire to his trailer, he walked across the street with his baby to Mr. Curtis's store. The Defendant said, "I didn't hurt the baby." Mr. Curtis said that the Defendant did not seem "excited like I thought he should be." He also testified that the Defendant took a vial out of his pocket that contained some type of powder, ingested the substance, and bought a Coke to wash it down.

On cross examination, Mr. Curtis admitted that the actions he observed on October 26, the shootings and the trailer fire, did not appear to be the acts of a person in his right mind. He reiterated that the Defendant did not react the way that one would expect immediately after committing the acts of murder and arson. He also agreed that the Defendant could be characterized as "different" or "odd." However, Mr. Curtis stated that the Defendant was a very attentive father and the primary care-giver to his children.

Bill Allen, one of the Defendant's neighbors in the trailer park who had known the Defendant for approximately two years, testified on behalf of the Defendant. He testified that he observed the Defendant shoot his wife, Nina. Mr. Allen said that, when the Defendant walked by the victim's body after the shooting, he said to the victim, "See you later," as though nothing had happened. Mr. Allen characterized this as "strange." However, upon further questioning by defense counsel, he indicated that the Defendant "seemed like everyone else."

On the night before the shooting, Mr. Allen had been in the Defendant's trailer. He testified that he observed no conduct of the Defendant that he would deem out of the ordinary. However, he did state that the Defendant told him that "if anybody come to take his kids that he would take care of them." On that night, the Defendant also showed Mr. Allen a rifle. Mr. Allen also testified that he bought the Defendant a six-pack that night, but he did not witness the Defendant drinking any

alcohol. Furthermore, he stated that he had seen the Defendant taking some sort of pills in the past, but he did not observe the Defendant take any pills on the night before the shooting.

Marvin Farris, the police investigator who interviewed the Defendant following the shooting, testified that, at the time of the interview, the Defendant did not appear to be under the influence of drugs or alcohol. Mr. Farris advised the Defendant of his constitutional rights, which the Defendant appeared to understand. After waiving his rights, the Defendant gave Mr. Farris a detailed account of the shooting, including details of the argument he had with the victim in the trailer, how she ran out of the trailer with the baby, how he took his rifle and shot into Christy Rominger's car, how he shot Nina five or six times, and how he shot other cars parked nearby. At the end of his statement, the Defendant told Mr. Farris, "I ran down toward Jackie Curtis' to call the police." Mr. Farris testified that, throughout the entire interview, the Defendant showed no emotion or sign of anxiety.

Dana Christine Rominger Brown, the victim's niece, when she was asked on cross-examination whether she would describe the Defendant as having a "very different personality," testified that "[i]t was just a person that sometimes you meet a person that you don't like." She also stated that "[a]nyone that can do what he did cannot be considered rational."

During the State's cross-examination of Nancy Smith, the Defendant's cousin, she admitted that from early 1985 to the time of the shooting in October 1989, the Defendant had not made any attempt to commit suicide or had any mental problem that required treatment.

In its cross-examination of Dr. Tramontana, the State presented the results of the Minnesota Multiphasic Personality Inventory (MMPI), which had been administered to the Defendant. According to Dr. Tramontana, the MMPI is "a questionnaire that is used in assessing general personality and psychopathology." The results were dated June 15, 1991, and they were prepared by Doctor Myers with Brainerd Psychological Services. The MMPI profile on the Defendant was considered invalid by Dr. Myers, and Dr. Tramontana agreed that he, too, found the findings of the MMPI to be invalid. Dr. Tramontana explained that one possible explanation for the unreliability of the MMPI results was that the Defendant had fabricated or exaggerated his symptoms.

The State also cross-examined Dr. Bernet regarding the report that he prepared as a result of his evaluation of the Defendant. Initially, the trial court ruled that Dr. Bernet could testify to the contents of the report, in which the doctor stated his opinion that the Defendant's mental deficiencies were not serious enough to constitute an insanity defense. However, the next day, the trial court instructed the jury that, under the new insanity statute, it was error to admit this portion of Dr. Bernet's testimony and that they should disregard it.

Until 1995, the statutory definition for insanity was as follows: "Insanity is a defense to prosecution if, at the time of such conduct, as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law." Tenn. Code Ann. § 39-11-501(a) (repealed 1995). Moreover, under the pre-1995 insanity statute, both prosecution and defense witnesses were allowed

to testify as to whether a defendant was legally insane at the time of the commission of an offense. See State v. Flake, 88 S.W.3d 540, 550-51 (Tenn. 2002); State v. Perry, 13 S.W.3d 724, 740 (Tenn. Crim. App. 1999). In 1995, our legislature amended the insanity statute in its entirety. The new section on insanity states,

> It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

Tenn. Code Ann. § 39-11-501(a) (1995) (emphasis added). Therefore, the new insanity statute alters the definition of insanity and makes insanity an affirmative defense, which the defendant bears the burden of proving by clear and convincing evidence. Moreover, under the current insanity statute, "No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone." Id. § 39-11-501(c) (1995).

In this case, the new statutory provision of section 501(c) does not apply because Dr. Bernet did not testify to the Defendant's sanity as set forth in the amended section 39-11-501(a). In other words, Dr. Bernet testified that the Defendant's mental deficiencies were not serious enough to support an insanity defense under the old insanity statute. He did not testify as to whether the Defendant was insane under the new version of section 39-11-501(a). Therefore, Dr. Bernet's testimony should not have been excluded by section 39-11-501(c). The trial court's initial ruling that Dr. Bernet should have been allowed to testify to his opinion that the Defendant's mental impairments were not serious enough to support an insanity defense under the pre-1995 statute was correct. However, the jury was instructed to disregard this evidence. When considering the sufficiency of the evidence, we must review the evidence considered by the jury to determine whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In this case, because the jury was specifically instructed not to consider this evidence, we too are precluded from considering the State's cross-examination of Dr. Bernet on this point in our sufficiency review.

In analyzing whether the State carried its burden of proving the Defendant's sanity beyond a reasonable doubt through lay testimony and cross-examination of the Defendant's experts, we look to prior case law for guidance. To reiterate, our supreme court has held that

> This burden can be met by the state through the introduction of expert testimony on the issue, or through lay testimony where a proper foundation for the expressing of an opinion is laid, or through the showing of acts or statements of the petitioner, at or very near the time of the commission of the crime, which are consistent with sanity and inconsistent with insanity.

Edwards v. State, 540 S.W.2d 641, 646 (Tenn. 1976). The defendant in Edwards shot and killed his sister on June 7, 1972. The defendant had been under the care of psychiatrist Walker who had diagnosed the defendant as schizophrenic and placed him on medication. Dr. Walker saw the defendant on June 2, 1972, and, according to our supreme court's opinion, "did not consider [the defendant's] mental condition serious enough to require treatment other than the taking of tranquilizers." Id. at 647. After the homicide, Dr. Walker associated another psychiatrist, Dr. Aivazian, who first saw the defendant on June 12, 1972. Dr. Aivazian also diagnosed the defendant as schizophrenic, but testified that the defendant was not psychotic at that time and "also expressed the opinion that [the defendant] knew what was going on around him during the day of the homicide." Id. at 646. Both psychiatrists testified that, in their opinions, the defendant had been insane within the legal definition on the day he shot and killed his sister. However, they also both testified that there were times when the defendant would know right from wrong. In rebuttal, the State called a psychological examiner employed by a state mental hospital. She testified that the defendant had not been psychotic or mentally deranged at the time of the shooting, and did know right from wrong. She also testified that she thought the defendant was faking mental illness. The State also called lay witnesses who had seen the defendant before the shooting and testified that the defendant had appeared normal and capable of distinguishing between right and wrong. Found particularly significant by the court was "the fact that before the police arrived on the scene, [the defendant] telephoned his mother and told her that he had shot [his sister] and was sorry." Id. at 647. Based on this proof, the court found that the State had carried its burden of proving the defendant's sanity.

In State v. Green, 643 S.W.2d 902 (Tenn. Crim. App. 1982), this Court described the expert testimony establishing the defendant's insanity as "clear, consistent, and convincing." Id. at 908. The State offered no expert testimony in rebuttal. Rather, "[t]he State's rebuttal evidence, offered to establish the defendant's sanity at the time of the offense, consisted of testimony by five Chattanooga police officers and a former county employee." Id. at 909. The first of these officers, who arrested the defendant, described the defendant as "cooperative," "coherent," and "intelligent," but conceded that he had asked the defendant's mother if he had "mental problems." Id. Other officers, encountering the defendant in episodes of vagrancy near the time of the offense, testified that they had not noticed anything out of the ordinary in their dealings with the defendant. The county employee testified that he had given the defendant a ride on the day the defendant killed the victim, and, during their forty-five minutes together, noticed nothing out of the ordinary. On the basis of this testimony, the State argued at trial that the defendant had not been insane at the time he killed the victim, but just "a little bit different." Id. at 910. Rejecting the State's theory, this Court held:

> the testimony of the various State witnesses, all of whom had had only brief contact
> with [the defendant] over a period of several weeks and described him as "normal,"
> is not inconsistent with a determination that [the defendant] was insane at the time
> of the offense. The medical experts testified, and their testimony is unrefuted, that
> a paranoid schizophrenic can operate in a seemingly normal way.

Id. This Court described the State's theory that the defendant had not been suffering from a mental incapacity at the time of the offense as "totally demolished by the strength of the defendant's insanity proof at trial." Id. at 912. This Court further found that, "although the acts of the defendant at or near the time of the killing were arguably 'consistent with sanity,' quite obviously they were not also 'inconsistent with insanity.'" Id. at 913. Thus, the State failed to meet its burden of proving the defendant's sanity beyond a reasonable doubt.

In State v. Clayton, 656 S.W.2d 344 (Tenn. 1983), four expert witnesses diagnosed the defendant as a paranoid schizophrenic. One of the doctors was quoted by the court as describing the defendant as "grotesquely ill." Id. at 351. All of these expert witnesses also testified that the defendant did not comprehend the wrongfulness of his act in killing the victim. The only testimony offered by the State in rebuttal to this proof was testimony from a police officer that, after his arrest, the defendant had been remorseful and so must have known that "he did wrong." Id. The expert witnesses were also unanimous in finding that the defendant was not able to conform his conduct to the requirements of the law. The State offered no proof whatsoever to rebut this testimony. Upon this proof, our supreme court concluded that the State had failed in its burden of proving the defendant's sanity.

In State v. Overbay, 874 S.W.2d 645 (Tenn. Crim. App. 1993), the State conceded the defendant's mental illness. There was also unchallenged medical proof that the defendant was incapable of understanding or appreciating the wrongfulness of his conduct. The State introduced no expert proof but contended through lay testimony that the defendant's actions in committing the murder for which he was being tried, were consistent with sanity and inconsistent with insanity. This Court found the proof to be insufficient:

> the acts of this defendant on the date of the offense qualified as consistent with sanity but not inconsistent with insanity. Following police directives, asking for cigarettes, responding to questions, and placing the rifle into the trunk of his father's car did not, according to all of the medical testimony, indicate that the defendant acted in a manner at odds with his diagnosis. None of the lay witnesses for the state had any long period of association with the defendant or any particular insight into his mental health. None were able to render an opinion on the sanity of the defendant. Certainly, there were no facts establishing any foundation to support such a lay opinion.

Id. at 651. Thus, this Court found that the State had failed in its attempt to establish the defendant's sanity.

In State v. Jackson, 890 S.W.2d 436 (Tenn. 1994), two mental health experts established that the defendant had been suffering from a mental illness at the time he shot and killed the victim. In rebuttal, the State offered two lay witnesses who testified "that in their limited experience with the defendant he: 1. lived alone and was able to care for himself; 2. borrowed money and food; 3. had a good memory; 4. made appropriate responses to questions; and 5. appeared normal." Id. at 441.

-13-

However, the State's own expert stated that these observations were "not inconsistent with the behavior typically associated with the defendant's particular mental illness." Id. Thus, our supreme court concluded that "the State's evidence, though <u>consistent</u> with sanity, does not establish sanity because it is not <u>inconsistent</u> with insanity." Id.

In <u>State v. Sparks</u>, 891 S.W.2d 607 (Tenn. 1995), our supreme court again addressed the sufficiency of the State's proof in response to a claim of insanity. Three defense experts testified that the defendant suffered from schizophrenia and that he was psychotic at the time he shot and killed his mother. Our supreme court found that "[t]heir testimony established that all of the defendant's actions, from his calm demeanor to his erratic temper, and even the unprovoked killing of his mother, were consistent with schizophrenia." Id. at 616. To counter this proof, the State introduced lay testimony of the following:

> the defendant had received his monthly injection of medication, the defendant bought the pistol and ammunition with which the crime was committed, he appeared to be calm after the crime, he called 911 and he was able to remember the events of the crime; the stepfather's opinion that he had never felt the defendant was mentally ill; the statements made by the jail nurse that the defendant did not act unusual on the night that he was arrested, by Detective Widener that the defendant "acted" as if he knew the wrongfulness of his act and could conform his conduct to the requirements of the law, and by the defendant that "you can't blame a fellow for trying."

Id. at 616-17. In reviewing the adequacy of the State's proof, our supreme court held that "[t]he lay opinion of the police officer was not supported by an adequate foundation, and even though the record contains evidence of acts and statements of the defendant which are consistent with sanity, they are not inconsistent with insanity." Id. at 617. Thus, the State had failed to carry its burden of proving the defendant's sanity.

We note that in both <u>Jackson</u> and <u>Sparks</u>, two of the most recent Tennessee Supreme Court opinions written under the old insanity statute, each respective defendant offered expert witnesses who unequivocally testified that the defendants met the statutory test for insanity. The instant case is factually distinguishable in that Doctors Tramontana and Bernet testified that the Defendant's mental condition could have affected his ability to appreciate the wrongfulness of his conduct or to conform his conduct to the law, but neither doctor testified that the Defendant was, in fact, insane at the time of the homicide.

We are quick to recognize that "[a] point of tension arises in terms of the trier of fact and the reviewing courts determining what is actually consistent or inconsistent with insanity and what weight is to be given expert testimony." <u>State v. Vence Edward Mason</u>, No. 02C01-9201-CC-00004, 1993 WL 270614, at *8 (Tenn. Crim. App., Jackson, July 21, 1993). However, we conclude that, in the light most favorable to the State, the evidence in this case is sufficient to support the jury's finding that the Defendant was sane at the time of the homicide. While the Defendant had an

extensive history of mental illness, there is no evidence that he was hospitalized or in need of treatment between early 1985 and the time of the murder in 1989. This, coupled with Dr. Bernet's testimony that people who suffer from schizo-affective schizophrenia will have "good periods" because the disease tends to "come and go," entitled the jury to find that, at the time of the homicide, the Defendant was in such a "good period" and was unaffected by his disorder.[3]  Several lay witnesses, including Vickie Lynn Estelle, Joe Vann, Jack Curtis, and Bill Allen, testified that the Defendant, while he may have been "different," did not act in an unusual or bizarre way. Additionally, Vickie Lynn Estelle and Jack Curtis testified that the Defendant was a responsible and attentive father to his two young children.  Dr. Stephen Rogers testified that, on the day before the murder, the Defendant was, in his medical opinion, "stable."

Former police investigator Marvin Farris testified that the Defendant gave him a detailed account of the events of October 26, 1989, including how he shot his wife and ran to Jack Curtis's store "to call the police."  From this testimony, a rational jury could find that the Defendant appreciated the wrongfulness of his conduct.

Furthermore, the jury could have determined from the Defendant's actions leading up to the shooting that he was sane.  Vickie Lynn Estelle testified that, as he left the convenience store on the afternoon of October 25, the Defendant said to her and the victim, "You bitches will be sorry.  You will pay."  Kevin Helms testified that the Defendant "kept saying he was ready to kill someone," bought two gallons of either gasoline or kerosine, and showed him his assault rifle.  The Defendant also showed his rifle to Bill Allen and told him that "if anybody come to take his kids that he would take care of them."

Joe Vann testified that the Defendant threatened to kill his whole family if they did not tell him where Nina was.  He also stated that he would only be sent to Moccasin Bend Mental Health Institute and would be out in time to "come back and piss on [their] graves."  Mr. Vann also explained that he had witnessed a conversation in which the Defendant described how to feign a mental illness.

Elizabeth Vann testified that, when she told the Defendant that she did not know where Nina was, the Defendant went to his car and got his eight-month-old baby.  The Defendant then held the baby up and said, "I'm just going to blow his damn brains out, and also Vanessa" and "I'm going to kill that damn bitch Nina."  When Ms. Vann asked the Defendant to give her the baby, the Defendant said, "There ain't no damn bitch or no son-of-a[-]bitch going to get that baby."

Significantly, no expert testified that the Defendant's behavior, as described by the lay witnesses, was consistent with insanity.  To the contrary, these descriptions were not consistent with the experts' explanation of how the Defendant's mental illness affected him.  The expert witnesses in this case testified that a person suffering from schizo-affective schizophrenia and damage to the

---

[3]By way of analogy, in Forbes v. State, 559 S.W.2d 318, 325 (Tenn. 1977), our supreme court concluded that "a paranoid schizophrenic is not legally insane under the M'Naghten rules when he is in a period of remission."

frontal lobe of the brain would have difficulty focusing, organizing and premeditating. However, as described by the lay witnesses, the Defendant's actions and threats prior to killing the victim show an ability on his part to focus on his goal of finding Nina, and to premeditate killing anyone that he perceived to be a threat tho his child. Obviously, the Defendant was ultimately able to remain focused and organized long enough to carry out his threat. Therefore, the jury was entitled to conclude that the actions of the Defendant on the night before the murder were inconsistent with the mental illness from which the experts concluded the Defendant suffered. See Edwards v. State, 540 S.W.2d at 646.

Finally, Dr. Tramontana admitted that the Defendant's results on the Minnesota Multiphasic Personality Inventory were invalid, and one possible reason for their invalidity would be that the Defendant exaggerated or feigned his symptoms.

It is our opinion that the evidence, taken in the aggregate, is sufficient to support the jury's finding that the Defendant was sane at the time the crimes were committed. Therefore, the judgment of the trial court is reversed, and the jury verdicts finding the Defendant guilty of first degree murder, aggravated assault, and arson are reinstated. Because the trial court has yet to act as thirteenth juror pursuant to Tennessee Rule of Criminal Procedure 33(f) or to rule upon the issues raised in the Defendant's motion for a new trial, we remand this case to the trial court for consideration of these issues and for sentencing for his aggravated assault and arson convictions.

_____
DAVID H. WELLES, JUDGE